E. V. LEWIS ET AL. V. CITY OF FORT WORTH ET AL.

No. 7034. Decided January 22, 1936.
(89 S. W., 2d Series, 975.)

*Johnson & Moore* and *B. Y. Cummings,* all of Fort Worth, for appellants.

The purposes for which the proceeds of bonds by a municipal corporation may be expended must be distinctly specified in express words or necessarily or fairly implied in or inci-

dent to the powers expressly granted, and those essential to the accomplishment of the declared object or purpose, not simply convenient, but indispensible. Moore v. Coffman, 189 S. W., 94; Ardrey v. Zang, 127 S. W., 1114; City of Beaumont v. Priddie, 65 S. W. (2d) 434.

R. E. Rouer, Geo. C. Kemble, J. M. Floyd, and R. B. Young, Jr., all of Fort Worth, for appellee.

The city having voted bonds for the "constructing,. building, equipping, and improving pleasure grounds," etc., may expend the proceeds of said bonds to construct on said grounds, when secured, buildings of various types and kinds for the exposition of live stock, agricultural and commercial products, an auditorium and such other buildings as may be necessary. Mayer v. Kostes, 71 S. W. (2d) 398; 31 Texas Jur., 1332, sec. 4.

MR. JUSTICE CRITZ delivered the opinion of the court.

This case is before this Court on certified questions from the Court of Civil Appeals for the Second District at Fort Worth. The certificate fairly states the facts and issues involved. It is as follows:

"This suit was instituted in the Ninety-Sixth District Court of Tarrant County, Texas, by twelve citizens and taxpayers of the City of Fort Worth praying for an injunction against the City Council of said city to restrain them from using any of the moneys that they might receive from the sale of designated bonds for the purposes hereinafter stated.

"As a basis for the injunctive relief sought, it was alleged that the proposed purposes for which said bonds would be used are 'wholly unauthorized by the Charter of the City of Fort Worth and the Constitution and Laws of the State of Texas and is wholly foreign to the purposes as designated upon the official ballot provided the voters at said election.'

"To the petition the city filed an answer to the merits, and upon a full hearing the following was filed as an agreed statement of the facts:

" 'BE IT REMEMBERED that upon the trial of the above entitled and numbered cause that the following are the facts, and the only material facts, proven before the court, and the same, as herein set forth, are hereby agreed to by each and all of the parties, plaintiffs and defendants, as being the true facts so proven before the court, and they are as follows:

" '1.

" 'The plaintiffs named in the original petition on file in this cause, and each of them, is a resident citizen and qualified voter, and tax payer of the City of Fort Worth, Tarrant County, Texas, and owns property within said city subject to taxation, and that a levy of a tax for the purpose of paying off the bonds herein mentioned will constitute a charge and lien against said property of each of said plaintiffs at all the times mentioned in the plaintiffs' said petition.

" '2.

" 'That the defendant, City of Fort Worth, is a municipal corporation, duly and legally organized under Title 28, Chapter 13, of the Revised Civil Statutes of the State of Texas, under what is known as the Home Rule Amendment to the State Constitution, governing cities of more than Five Thousand inhabitants, and operates under a charter heretofore duly and legally adopted by the qualified voters of said city. That George D. Fairtrace is the City Manager and agent of said city, and that each and all of the other defendants named in the plaintiffs' original petition are members of the City Council of the City of Fort Worth, and each and all reside in said city, county and state.

" '3.

" 'That on the 3rd day of September, 1935, an election was held in said City of Fort Worth, Texas, the purpose of which was specifically set forth on the face of the official ballot which was furnished to the voters and used by them in said election, and which was as follows: to determine whether or not the said City of Fort Worth, Texas, through its City Council, should issue its negotiable bonds in the principal sum of Six Hundred and Eighty Seven Thousand and Five Hundred ($687,500.00) Dollars "for the purpose of constructing, building, equipping and improving pleasure grounds, parks and playgrounds for the City of Fort Worth, and for securing and acquiring the necessary lands and sites therefor, said bonds being payable serially as may be determined by the City Council, so that the last maturing bonds shall become payable within forty years from the date thereof, payable semi-annually, and to levy a sufficient tax to pay the interest on said bonds and to create a sinking fund sufficient to redeem said bonds at the maturity thereof." That at said election a majority of the qualified voters of said city voted in favor of issuing the proposed bonds in the amount above named and of the description above specified, and for the purposes stated

on said official ballot used by the voters at said election, which is quoted hereinabove.

" '4.

" 'It is further stipulated and agreed by and between the plaintiffs and the defendants herein that it is the intention of the defendants to use a portion of said bond funds for the purpose of building and equipping a building to be known as an Auditorium Building; and a building to be known as a Coliseum Building; and buildings to be used for the housing and keeping of various types and kinds of live-stock for exhibition purposes; and buildings to be used for exhibiting agricultural, live-stock, and commercial exhibits; and necessary buildings for police and fire protection of the premises; and also rest rooms, and such necessary building, or buildings to accommodate the people who patronize the grounds.

" '5.

" 'It is further stipulated and agreed that it is the intention of the defendants that during such times as the premises, which are to be acquired by the proceeds arising from the sale of said bonds, may be used for shows that a charge of admission will be made against the public for the privilege of viewing such shows; and that such shows will be exhibited in buildings to be located on the land paid for in part by the proceeds arising from the sale of said bonds; and it is also agreed that it is the intention of the defendants to have operated on said grounds a rodeo, and that the public will be charged an admission fee to see the same; but, it is understood and agreed that the Fat Stock Show will only use the grounds during certain periods, and that at other times it will be open to the free use of the public.

" '6.

" 'It is further stipulated and agreed that it is the intention of the defendants to operate for the City the Centennial Exposition on said grounds, or a portion thereof, during certain periods in 1936 and 1937, and that subsequently the City of of Fort Worth will enter into a contract with the Southwestern Exposition and Fat Stock Show to lease and use a portion of the facilities from the City of Fort Worth, for which a rental will be charged.'

"The trial court first granted a temporary writ of injunction pending the hearing of the petition on its merits, but the temporary injunction was later dissolved and plaintiffs have prosecuted an appeal to this court from that order. The appeal is now pending in this court and undisposed of.

"For your convenience, we refer you to Arts. 701, 702 and 703 of the Revised Civil Statutes 1925, Chapter 1, Title 22, which are as follows:

" 'Art. 701. The bonds of a county or an incorporated city or town shall never be issued for any purpose unless a proposition for the issuance of such bonds shall have been first submitted to the qualified voters who are property tax payers of such county, city or town.'

" 'Art. 702. In all cases when the governing body of a county, city or town shall order an election for the issuance of the bonds of the county, city or town or of any political subdivision or defined district of a county, such body shall at the same time submit the question of whether or not a tax shall be levied upon the property of such county, city or town, political subdivision or defined district for the purpose of paying the interest on the bonds and to create a sinking fund for the redemption of the bonds.'

" 'Art. 703. The proposition to be submitted shall distinctly specify:

" '1. The purpose for which the bonds are to be issued;

" '2. The amount thereof;

" '3. The rate of interest;

" '4. The levy of taxes sufficient to pay the annual interest and provide a sinking fund to pay the bonds at maturity;

" '5. The maturity date, or that the bonds may be issued to mature serially within any given number of years not to exceed forty.'

"Also, Section 19, Chapter 25, of the Charter of the City of Fort Worth, embodying those statutory provisions.

"Appellants insist that by reason of those provisions of the statutes and of the City Charter the proposed uses of the bonds in controversy are foreign to the purposes authorized by the election for the issuance of the bonds, and therefore such proposed uses will be unlawful.

"In view of the importance of the question, involving matters of great public interest to the City of Fort Worth and its inhabitants, and the fact that we are in doubt as to its proper disposition, we deem it advisable to present to your Honorable Court for adjudication the following questions, as requested by all parties to this suit, to-wit:

"1. Has the City Council of the City of Fort Worth lawful authority to use the proceeds of the sale of the proposed bonds for all of the purposes intended as shown in the agreed statement of facts?

"2. If the Council cannot use the funds for all of such purposes, then will it have lawful authority to use such proceeds for some of those purposes only? And, if so, then

"3. Find and answer for which purposes the funds may be so used and what purposes will be unauthorized?"

OPINION.

Chapter XIX of the Charter of Fort Worth contains the following applicable provisions:

"Section 4. The Public Recreation Board shall have power and authority to equip, operate, supervise and maintain playgrounds, athletic fields, swimming centers, *indoor* recreation centers, municipal camps, or other recreation facilities on or in any public grounds or buildings either within or without the City, which the City Council may from time to time provide * * *."

"Section 7. The City Council of the City of Fort Worth shall have the authority to issue and sell bonds for the purchase and improvement of playgrounds, athletic fields, neighborhood recreation parks; for the construction of swimming pools, recreation center buildings, and such other places and facilities of a permanent nature deemed necessary for carrying out the provisions of this Chapter of the Charter; * * *"

Section 19 of Chapter XXV of such Charter contains the following provision:

"The City council shall have authority to provide for the issuance and sale of bonds for permanent improvements and for any other legitimate municipal purposes as may be determined by the City Council; * * *."

It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted. It is also elementary that in instances where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully. In other words, a court has no right to substitute its judgment and discretion for the judgment and discretion of the governing body upon whom the law visits the primary power and duty to act. Of course, if such governing body acts illegally, unreasonably, or arbitrarily, a court of competent jurisdiction may so adjudge, but there the power of the court ends. Brown v. Humble Oil & Refining Co., 126 Texas, 296, 87 S. W. (2d) 1069. Of course this rule

applies to the expenditure of the proceeds of bonds issued for park purposes. City of Beaumont v. Matthew Cartwright Land & Imp. Co. (Texas Civ. App.), 224 S. W., 589.

■ It is admitted that these bonds are legal and that they were voted for legal purposes. As shown by the agreed statement of facts, they were voted "for the purpose of constructing, building, equipping and improving pleasure grounds, parks and playgrounds * * *, and for securing and acquiring the necessary lands and sites therefor." It follows from what we have said that the proper governing officers of the City have the right to expend the proceeds of such bonds for the purposes for which they were voted. Also, it follows that they have the right to exercise sound judgment and discretion in doing so.

■ In our opinion the expenditure of these funds for the things enumerated in the agreed statement of facts cannot in law be said to be foreign to the purposes for which these bonds were voted or contrary to the laws of this State or Charter of such City. Also, the action of the City in making such expenditures cannot, under this record, be said to be illegal, unreasonable, or arbitrary. In this connection we think the conducting of shows, rodeos, fairs, expositions, and other amusements intended by the City on the grounds and in the buildings contemplated is in harmony with the general purposes of pleasure grounds, parks, and playgrounds. Generally speaking, the term "park" now has a very broad meaning. This is especially true as applied to municipal parks. We now understand a municipal park to be a place where the public generally may go for various kinds of recreation and amusement. Wiggins v. City of Fort Worth (Texas Civ. App.), 299 S. W., 468.

Certainly the charter provisions above quoted are as broad as the general purpose for which the City intends to expend these funds. They are also as broad as the general meaning of the term "parks" as above defined. Also, we know of no authority which would prevent the charging of admission fees to shows and other things conducted in municipal parks.

Finally, we wish to say that we see no good purpose in going into an extended discussion of things which can be purchased with money provided for park purposes. It is sufficient to say that the great weight of authority is to the effect that the expenditures here contemplated come within the meaning of park purposes. In support of this holding we cite the fol-

lowing authorities: City of Wichita v. Clapp, 125 Kans., 100, 263 Pac., 12; Schmoldt v. Oklahoma City, 144 Okla., 208, 291 Pac., 119; Vale v. City of San Bernardino, 109 Cal. App., 102, 292 Pac., 689; Bryant v. Logan, 56 W. Va., 141, 49 S. E., 21, 3 Ann. Cas., 1011; State v. Dodge City, 123 Kans., 316, 255 Pac., 387; Spires v. City of Los Angeles, 150 Cal., 64, 87 Pac., 1026, 11 Ann. Cas., 465; Los Angeles Athletic Club v. City of Long Beach, 128 Cal. App., 427, 17 Pac. (2d) 1061; Laird v. City of Pittsburgh, 205 Penn., 1, 54 Atl., 324, 61 L. R. A., 332; Furlong v. South Park Commissioners, 320 Ill., 507, 151 N. E., 510.

We quote with approval the following from the opinion in the Laird Case, supra:

"A public park, in the popularly accepted meaning of the present time, may be comprehensively defined as a public pleasure ground. The definitions by the lexicographers do not vary much from this. Worcester calls it 'a piece of ground inclosed for public recreation or amusement'; Webster, 'a piece of ground, in or near a city or town, inclosed and kept for ornament and recreation'; the Century Dictionary, 'a piece of ground, usually of considerable extent, set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as an opportunity for open-air recreation.' No doubt the idea of open air and space, with the land kept in grass and trees, as if approximately in the state of nature, still inheres in the general understanding of the word, but it is no longer the dominating thought, as it formerly was.

\* \* \* \* \* \* \*

"With the change of manners and habits of the people came also a change in their associations with the use of words. The idea of a public park in or near a city as a place of resort of the people generally for recreation and amusement necessarily banished the idea of a home for wild beasts of the chase, even in a very modified state of nature. The trimming away of thickets and underbrush, the substitution of regular pathways, paved, and perhaps railed and artificially lighted, which would have been incongruous to our forefathers, now enter into the accepted idea of a park. The growth of sentiment for artistic adornment of public grounds and buildings is part of the history of our time and country. Public parks have come to be recognized as not only the natural place for walks and drives afoot, awheel, or with horse and carriage, for boating, skating, and other outdoor athletics, but also as

the appropriate and most effective location for monuments and statues, either to historic heroes or to pure art, fountains, flower displays, botanical and zoological gardens, museums of nature and of art, galleries of painting and sculpture, music stands and music halls, and all other agencies of aesthetic enjoyment of eye and ear. The parks of cultivated Europe are filled with works of art, and the great cities of this country are following fast in the same direction. Schenley Park in Pittsburgh, with which this case is immediately concerned, already devotes a portion of its space, as found by the court below, to the Phipps Conservatory of flowers, to music stands, and to the Carnegie Free Library Building, as well as to athletic grounds and a race course. The Carnegie Free Library Building, as also found by the court below, contains a free library, an art gallery, museum, and music hall, all free to the public."

From what we have said it is evident that we answer question No. 1 "Yes."

Our answer to question No. 1 renders it unnecessary to answer questions Nos. 2 and 3.

Opinion delivered January 22, 1936.