Argued March 4; reversed March 31, 1936

# SHAINWALD *v.* CITY OF PORTLAND ET AL.
## (55 P. (2d) 1151)

*Frank S. Grant,* City Attorney of Portland, for appellant.

*Arthur A. Goldsmith,* of Portland (Tyson Kinsell, of Portland, on the brief), for East Side Taxpayers' League, amicus curiae.

*Ernest Cole,* of Portland (Fred Wilhelm, of Portland, on the brief), for Multnomah Anglers and Hunters Club of Portland, amicus curiae.

BEAN, J. The city of Portland is located near the junction of the Willamette and Columbia rivers, the older business section being west of the Willamette river and the larger residential area to the east on the peninsula between the two rivers.

Sewers have been constructed and extended from time to time, using the deepest and most direct outlets into these two streams. At present there are 59 individual sewer outlets into the Willamette river and the Columbia slough, a flood channel of the Columbia river. All sewers are on the "combined" system, carrying storm waters as well as sanitary sewage. The Willamette river in its low-water flow, occurring in July to September, is only about 4,000 cubic feet per second.

The minimum flow of the Columbia river is about 60,000 cubic feet per second, but due to characteristics of its watershed this low flow comes in the winter months. During the summer season the discharge of the Columbia river is 100,000 to 120,000 cubic feet per second. Due to the sewage wastes of the city, added to the waste contributed by other up-river communities, the Willamette river is now and has been for years past seriously polluted. During low-water stages the oxygen falls below that desirable for support of fish life, and the presence of sewage is now, and has been for years, visibly apparent. The Columbia river absorbs all evidence of sewage pollution below the junction of the Willamette river. The only objectionable condition on the Columbia river side of the peninsula is in the Columbia slough, which is a small channel a short distance from the main river. For many years past the attention of the city and its council has been repeatedly called to the necessity of constructing a system of intercepting sewers to relieve the pollution in the Willamette river. The council was advised that the existing pollution of the Willamette river is not only detrimental to the public health of the city but is also detrimental in the following respects: (1) Danger to fish life; (2) danger to abutting property; (3) a reduction in recreational value of the Willamette river. Studies and various sanitary surveys have been made by engineers.

On or about June 26, 1933, it was deemed by the council to be an opportune time to inaugurate proceedings for the construction of a sewer system by reason of the fact that the legislature had adopted chapter 289, Oregon Laws of 1933, supplementing the charter powers, and Congress had enacted legislation providing for the loaning of funds at a low rate of interest for such

projects, as well as providing a grant. On June 8, 1933, there was presented, filed and adopted by the council, plans and specifications and a maximum cost estimate for a proposed sewage project, treatment plant and appurtenant facilities, as disclosed by Exhibits 1 and 2 attached to the answer. The first part of Exhibit 1 discloses what is contemplated by the plans and specifications. The type of treatment is given, the place where intercepting sewers are to be constructed, an explanation of the general flow sheet and storm water flow, and a statement of the proposed construction of intercepting sewers. As a sample of the specifications we quote the following:

"From the detritors the sewage will flow to three 150′ x 150′ mechanical clarifiers, also known as traction clarifiers, having a side-water depth of ten feet in each case, in which approximately 60 per cent of the suspended solids would settle. The settled sludge of approximately 95 per cent moisture, together with the skimmings from the clarifiers, will be pumped to the 50′ x 8′ sludge thickening tank. The effluent from the primary clarifiers will then enter thirty-seven aeration tanks, each 14′ x 14′ x 300′ long."

Also, as a sample of the specifications, we quote:

"Excess sludge will be wasted to a 50′ x 8′ sludge thickening tank, and after processing, would be pumped into the primary digestion tanks of which there will be not less than three nor more than six, each eighty-five feet in diameter by twenty-four feet depth. After not less than ten days nor more than twenty days digestion period in these tanks, the sludge will flow to not less than six nor more than twelve eighty-five feet in diameter by twenty-four feet depth secondary digestion tanks for between twenty and forty days digestion, giving a total of not less than thirty nor more than sixty days digestion, with which period approximately 63 per cent of the volatile solids will be reduced."

There is attached to the statement a diagrammatic flow sheet for a proposed activated sludge sewage treatment plan and a map showing a sewage treatment plant and intercepting sewers. There was a general estimate given of the cost, fixed at $6,000,000. As delineated on the map, the sewage flow is to be intercepted on both sides of the Willamette river, namely, from the southerly city limits along the east bank of the Willamette river to Junction "A", thence across the river to Junction "B" joining the west bank interceptor, coming also from the southerly city limits and continuing to Junction "C". As shown on the map, an interceptor is to be built along the east bank of the Willamette river from the point marked "O" northerly and easterly to the Peninsula Drainage Canal, also known as the Columbia slough, following said Peninsula Drainage Canal to Junction "D" of the interceptor coming westerly along said Peninsula Drainage Canal from point "Q", thence continuing southwesterly in Carey Boulevard, under the Willamette river to Junction "C", thence northerly to Plant No. 1, together with such booster pumping plants as will be determined, not exceeding six in number. The map or plan is attached to the specifications, which furnished information to the electors as to the general plan of the intercepting sewage plant.

On June 8, 1933, the council adopted resolution No. 20691, thereby submitting to the voters the question of whether the city shall avail itself of chapter 289, Oregon Laws 1933, and the inducements held out by the United States government and construct disposal facilities that will eliminate the use of the Willamette river for sewage, and pay the cost by the issuance and sale of self-liquidating bonds in an amount not exceeding $6,000,-000, the principal and interest of the bonds to be paid

from charges imposed for the services extended to the employment and use of the sewage disposal facilities and not to be paid by general taxation. On the same date the council enacted ordinance No. 64461, calling a special election for Friday, July 21, 1933, the date of a state election, for the purpose of submitting the question to the voters under the provisions of the resolution. The special election was held and the resolution was adopted by a majority vote of the electors, authorizing the issuance of the bonds and the construction of the sewage disposal plant.

Chapter 289, Oregon Laws 1933, provides that any incorporated city or town in this state is authorized to own, acquire, construct, equip, operate and maintain either within or without the statutory or corporate limits of such municipality, in whole or in part, sewers, sewer systems, sewage treatment, or disposal plant or plants, intercepting sewers, outfall sewers, force mains, pumping stations or ejector stations, with all appurtenances necessary, useful or convenient for the treatment and disposal of sewage, and shall have authority to acquire lands and rights of way therefor. The governing body of such a city (in this case we will call it the council) is granted authority to establish just and equitable rates or charges to be paid for the use of such facilities. The municipal council may, after referring the question of acquiring and construing such facilities to a vote of the qualified electors thereof, and after approval thereof by a majority of said electors, authorize the issuance of and cause to be issued bonds of such municipality for such purposes, either general obligation, limited obligation or self-liquidating in character in a sum authorized at such election. Such bonds may provide for the payment of both principal and interest

thereof from service charges to be imposed by the council for the services to be extended through the employment and use of such facilities. Section 5 of the act provides as follows:

"Before calling any election for the purposes herein set forth, the governing body of such city or town shall cause to be prepared proper plans, specifications and estimates of costs of any proposed facilities to be voted upon, which may be examined by any qualified elector of such municipality."

Section 6 is as follows:

"The authority hereby given shall be in addition to, and not in derogation of any power existing in any of said municipalities under any constitutional, statutory or charter provisions now or hereafter existing."

At the second special session of the legislature in 1933, the legislature, by chapter 13, which took effect December 9, 1933, amended section 5 so as to eliminate the word "proper".

The legislative charter of the city of Portland invested the city with power to construct within and without its corporate limits drains, sewers, sewage disposal structures, complete sewage disposal systems, pumping station gates and all other apparatus, structures and devices reasonably necessary or proper for drainage or sewer purposes: §§ 2, 3, 34, 36, 275a and 275c of the Charter; §§ 117, 162 and 164, Charter Ordinances; see *Pioneer Real Estate Co. v. Portland*, 119 Or. 1 (247 P. 319).

It is submitted that the council of the city of Portland did not cause to be prepared proper plans and specifications and estimates of costs of the proposed sewage disposal facilities before calling the special election on July 21, 1933, at which the matter was sub-

mitted to the voters of the city of Portland. It is contended that the specifications should be such as would be submitted for a bid for constructing the work, with all the necessary details therefor. The plan or map submitted to the electors is sufficient to inform them in regard to the general outline of the proposed works, and we are not aware that the plan can be criticized.

■ The primary or first purpose of the plans and specifications to be submitted to the electors is clearly for their information. The specifications submitted and adopted by the council give all the general information in regard to the sewage disposal plant that the electors would be likely to read or to understand. It is doubtful if any one except an engineer would understand all the specifications in regard to the construction of the sewage disposal plant, but the general features are all provided for so that the electors could intelligently vote upon the proposition. The plans and specifications, in so far as necessary for the electors to decide whether they will authorize the works and the issuance of the bonds, must necessarily be such as to give the electors information in regard to the general character of sewage disposal.

It is said that there are 59 sewers in the city of Portland emptying into the Willamette river and Columbia slough. The sewer proposed is described to connect, or intercept, with these 59 sewers, and we think the description is sufficient.

■ Chapter 289, Oregon Laws 1933, granting power to the city to construct a sewage disposal system as a public utility and pay the cost thereof by imposing charges for its use, is supplemental to and confirms the power existing in the city by the terms of its charter:

*Capen v. City of Portland,* 112 Or. 14 (228 P. 105, 35 A. L. R. 589) ; §§ 34, 151, 155, 275a and b, Charter; §§ 117, 162 and 164, Charter Ordinances of the city of Portland.

■ The plans and specifications, known in the record as the Baer plans and specifications, were adopted by the council by resolution No. 20691, on June 8, 1933, and were the only plans and specifications for the electors to consider or that were legally submitted to them for consideration at the election on July 21, 1933. These are shown in the record as Exhibit 1, which discloses what is contemplated by the general plan and general specifications; the type of treatment is given, place where intercepting sewers are to be constructed, an explanation of the general flow sheet, the storm water flow, and a statement of the proposed construction of intercepting sewers. This is followed by a general cost estimate.

We do not think it was necessary to have specifications for the electors' information to designate just how many nails were to be put into a board, used in the work, or how far apart they should be, or details of that kind. It is appropriate and legal for the city council to have prepared and to adopt further and more detailed specifications for the construction of the works, so long as they are supplemental to and not in conflict with the plans and specifications adopted June 8, 1933, and submitted to the electors. The council, by adopting the plans and specifications and estimate of cost referred to, substantially complied with the mandate of the statute in regard thereto: *Johnston v. District of Columbia,* 118 U. S. 19 (6 S. Ct. 923, 30 L. Ed. 75). As to the requirements for estimate of cost, see *Bautovich v. Great Southern Lbr. Co.,* 129 La. 857 (56 So. 1026. Ann. Cas. 1913 B, 848, and note) ; 21 C. J. 1049, § 1.

The word "proper" contained in section 5 of the act adds but little to the meaning of that section and might be termed argumentative. As to what "proper plans and specifications" means, the statute does not delineate or provide, and soon after the enactment of chapter 289 the word "proper" was eliminated from section 5 by the legislature. In 48 C. J. 1220, the author defines a "plan" as:

"A delineation; a design; a draft, a draft or form or representation * * *; the representation of anything drawn on a plane, as a map or chart; a scheme, a sketch; also a method of action, procedure, or arrangement.

"As applied to streets, a plat or survey indicating number, names, and locations of streets, their lines and courses, widths, grades, etc., as they are or are to be laid out and opened on the land, including all particulars germane to the general subject.

"Of public improvements, the general plan or system of work; a profile, drawing, or picture, showing in a general way the character of the work." See *Noice v. Schnell,* 101 N. J. Eq. 252 (137 Atl. 582, 589, 52 A. L. R. 965); *Bowden v. Kansas City,* 69 Kans. 587 (77 P. 573, 575, 66 L. R. A. 181, 105 Am. St. Rep. 187, 1 Am. Cas. 955); See also *Wetherill v. Pennsylvania R. Co.,* 195 Pa. 156 (45 Atl. 658, 659).

Doubtless the electors learned through the press that the council was proposing to dispose of sewage in the city by means of a sewage disposal system; that it was going to cost about $6,000,000; that bonds were proposed to be issued and the principal and interest of the bonds were to be paid from service charges imposed by the council for the use of the sewage disposal system and the taxpayer would not be required to pay the cost of the project through taxation. They would find that there were some documents on file in the auditor's

office which had been adopted by the council and were marked and called "plans, specifications and estimates". By an examination of Exhibit 1 the electors would find the "General Statement", which informed them that there had been submitted for public inspection plans and specifications and maximum cost estimates for a proposed sewage treatment plant and appurtenant facilities; that the type of treatment would be activated sludge; that it was proposed to build intercepting sewers on the east and west sides of the Willamette river from the southerly limits along the westerly and easterly harbor lines in a general northerly and northwesterly direction intercepting in their course all sewer outfalls on both sides of the river and an interceptor along the southerly shore of the drainage channel which is known as the Columbia slough, intercepting all outfall sewers of the St. Johns and northerly city districts and combining these interceptors, and that there would be built a treatment plant or plants to treat the entire flow of sewage of the city, with the exception of that section known as the Linnton district. They would find by examination of the map that the red lines show the proposed sewer intercepting and connecting lines, and that these connecting red lines show probable enlargement of existing intercepting and connecting lines. They could then examine another map which shows the diagrammatic flow sheet for a proposed activated sludge sewage treatment plant for the city. They could then continue reading the said general statement and find an explanation of the general flow sheet and also find a statement of how it is proposed to make provision for storm water flow, and a statement concerning general specifications. There is also available for them a statement as to the general cost esti-

mate. At the city engineer's office they may find on file special specifications and general requirements for the construction of pipe and concrete sewer, consisting of 35 pages of typewritten matter, indexed, showing 53 different items that make up the special specifications.

An examination of Exhibit 2 shows that is the report of the city engineer. The report gives not only general but detailed information concerning the construction of a sewage disposal system, and is accompanied by a map showing a tentative sewage disposal and intercepting sewer alignment and a map showing the diagrammatic flow sheet of the proposed activated sewage disposal plant for the city. We find nothing in Exhibit 2 in conflict with Exhibit 1.

It seems that there was ample information contained in the plans and specifications for the electors to vote upon the sewage disposal project, as described in the Baer report.

We are not dealing with cases involving plans and specifications and estimates of cost in special assessment proceedings. No property will be assessed with the cost of the improvement. Only those persons who use the service rendered by the utility will contribute to the cost, and that contribution is made in the form of service charges or service rates.

We are not dealing with cases that construe constitutional or statutory provisions requiring the awarding of public contracts to the lowest bidders upon the plans and specifications and estimates. Here the inquiry must be directed to the question as to whether the city's plans, specifications and estimates are sufficient for the information of the electors. It is not a question whether the plans, specifications and estimates of cost are suffi-

cient to intelligently inform a prospective bidder: see *Ampt v. City of Cincinnati,* 9 Ohio C. D. 690, affirmed without opinion in 60 Ohio St. 621 (54 N. E. 1097).

In *Arstill v. Fletcher,* 95 Or. 308 (187 P. 854), this court defined the word "plan" as used in connection with a public improvement project, namely, a drainage district improvement. The statute there under consideration provided that the supervisors should appoint an engineer, who should make all necessary surveys of the lands that were to be improved or reclaimed in part or in whole by any system of drainage, and make a report in writing to the board of supervisors with maps and profiles of his survey, which report should contain a plan for the draining and reclaiming of the lands. The statute provided that the maps and profiles should indicate, so far as necessary, the physical characteristics of the land, the locations of any public lot, railroads or other rights of way, etc. It was contended that the "plan" adopted by the board of supervisors did not meet with the requirements of the statute, in that it did not contain minute specifications about where the earth to be taken out of the drainage ditch was to be deposited. This court, in an opinion by the late Mr. Justice BURNETT, said:

"'Plan' contemplates 'the representation of anything drawn on a plane, as a map or chart'; * * * In other words, it is a map. It does not include the delineation of cross-sections or elevations. It has to do with the length and direction of the ditches designed to effect the drainage desired. It is not contemplated by the act that the plan shall include particular and minute specifications about where each spadeful of earth shall be deposited. These things must be left in practice to the governmental discretion of the officers of the drainage district."

■ The statute of the state of Washington, known as the Port District Act, Laws of 1911, Chapter 92, section 9, provided that before ordering any improvements the port commission should adopt "detailed" plans, estimate the cost, and by resolution submit the expenditure to an election. In *Paine v. Port of Seattle,* 70 Wash. 294 (126 P. 628, 127 P. 580), the court construed that statute. The port proposed to issue and sell certain bonds to procure funds with which to purchase property and construct improvements in the port and district. The commission adopted plans that gave a general description of the land and the location upon the land of the docks, wharves and other improvements to be constructed and made an estimate of the cost of each improvement. The taxpayer plaintiff, however, alleged that the plans fell short of being "detailed", in that neither specifications nor working plans had been prepared by the port commission in sufficient detail to properly call for bids. The court said:

"We do not think it was necessary that the plans and specifications to be adopted at that time should be such complete detailed plans and specifications as would be necessary to have for the final construction of the improvement. We think the statute is satisfied when the adopted plans are such as to fairly inform the voters of the general nature and extent of the proposed improvement. We are of the opinion that the alleged facts show the adoption of such plans as satisfies the requirement of section 9, even assuming that that section is controlling here."

That case is in point. See also *Greaves v. City of Villisca,* 217 Iowa 590 (251 N. W. 766).

The election was regularly held and the electors of the city voted in favor of installing a sewage disposal system. The ballot title states:

"shall the city of Portland, Oregon, dispose of sewage in the city by means of sewage treatment, reduction and disposal plants and facilities and pay the cost of the construction thereof in the manner authorized by chapter 289, Oregon Laws, 1933 by issuing self-liquidating bonds * * * not exceeding six million dollars."

There is no suggestion or suspicion that any elector voted on the proposition without a full understanding of the necessary features of the proposition.

■ Criticism is made by the opposition, referring to Exhibit 1, that in the general statement it is proposed to combine the interceptors in the most economical and feasible manner, without designating in just what manner they would be combined. It is not fatal to the proceedings to leave some small details to the engineer having charge of the construction.

■ The plan is criticized for the reason that the number and size of some of the paraphernalia for the sewage disposal is not definitely fixed. As stated, there are 59 sewers emptying into the Willamette river and Columbia slough. In order to fix the size of the interceptors exactly, it would be necessary to measure the outfall of these sewers which would be simply impossible and can not be done. The plan is to have the interceptors and other equipment of sufficient size to take care of the sewage from these sewers and other sewers for a population of 500,000. There was a substantial compliance with the requirements of the statute and charter.

The rule is well settled and constantly enforced that matters of detail in the description and material to be used, or the manner of construction, need not be specified in the improvement ordinance, especially where these are provided by general ordinance. In 5 Mc-

Quillin, Municipal Corporations, (2d Ed.) 298, § 2034, we read:

" 'It is not to be expected that an ordinance of this kind,' remarked the Supreme Court of Illinois, 'should set forth the details and all particulars of the work. Indeed, this is not contemplated and the statute requires nothing of the kind. A substantial compliance with its provisions is all that is required.' Usually general directions as to manner and plan of the work will be held sufficient."

Under the requirements of chapter 289, Oregon Laws 1933, and the charter of the city of Portland, in order to submit the matter to the voters, the plans and specifications need not be minutely detailed: *Paine v. Seattle,* supra; *Bostick v. Pernot,* 165 Ark. 581 (265 S. W. 356); *Jenney v. Des Moines,* 103 Iowa 347 (72 N. W. 550).

■ Thus far in the proceedings for the holding of the election and voting for the establishment of the sewage disposal system, we think there was a substantial compliance with the statute. After that there was a radical change. After the council adopted the plans and specifications known as the Baer plans and called the election, held July 21, 1933, for the electors' vote thereon, the report on the sewage disposal matter by the board of consulting engineers, which is radically different from the Baer plans and specifications, with accompanying map, was filed with the council on July 19, 1933.

A portion of the report will show a large divergence. Paragraph 3 of the report contains the following:

"The site for a treatment plant (except for Linnton and a portion of the St. Johns district) should preferably be near Columbia River so that effluent from the works may be discharged into that stream. A suitable

site which will always be remote from urban development is available."

Paragraph 5 of the report provides:

"The disposal plant on Columbia River, if constructed, should be designed for primary treatment only. Such treatment should provide for removal of practically all solids in suspension and their disposal by a process of separate sludge digestion. The effluent from the works should be discharged into deep water in Columbia River where it will be rapidly dispersed. The dilution obtainable is more than 25 times that customarily considered safe for disposal of sewage by dilution."

However valuable or practicable the report may be which was filed after the election was called, it was no part of the proceedings leading up to or constituting the election whereby the voters cast their vote in favor of the sewage disposal system in accordance with the Baer plan.

On August 3, 1933, the council, by resolution No. 20747, authorized and directed an application to be made to the administrative agencies of the National Industrial Recovery Act for a loan of $6,000,000 to be secured by said bonds. Pending the preparation of this application the council employed one of the leading consulting engineers, and his report was filed October 3, 1933. On August 4, an application was filed with the Portland office of the Public Works Administration for a loan of $6,000,000, and a grant of $2,000,000. This application was based on the general plans adopted June 8, 1933, known as Exhibit 1. It is said that this application was refused because the Public Works Administration desired further engineering data. Upon submission of both plans and specifications to the federal administration, the attorneys passing upon the

legal phase of the issuance of the bonds rejected the same largely for the reason that the electors had not adopted or authorized a sewage disposal system in accordance with the plans and specifications of the board of consulting engineers. In order for the construction of a sewage system in accordance with the plans and specifications of the board of consulting engineers, to which reference has been made, it would be necessary for an election to be held and a favorable vote cast therefor.

■ The issuance of self-liquidating bonds in the sum of $6,000,000, plus the amount of any moneys received as a gift from the United States government for the purpose of paying the cost of construction of the sewer project, will not exceed the debt limitation imposed by the charter or by the statute. The charter and the statute expressly exclude public utilities certificates or self-liquidating bonds from the limitation of the bonded indebtedness: Chap. 289, Oregon Laws 1933; Chap. 306, Oregon Laws 1933; § 160, Portland Charter.

■ Where a contract creating indebtedness provides for a special fund with which to meet indebtedness as it accrues and no general liability is thereby created against the municipality, such an indebtedness is not within the constitutional inhibition against debt in excess of the fixed amount: 44 C. J. 1131, § 4064; *Butler v. City of Ashland,* 113 Or. 174 (232 P. 655).

■ At the time resolution No. 20691, containing the provision that before issuance and sale of the bonds the form should be approved by the Reconstruction Finance Corporation of the United States of America, was adopted, the Reconstruction Finance Corporation of the United States of America was the only United

States Agency then in existence from which the city could borrow funds, and naturally the council had that point in mind and anticipated, in the event of the approval of the proposed construction of the project by the voters, that an application for a loan would be made to that agency, and there should be authority, first, to make application for the loan; second, to receive the loan; and, third, to issue the securities in such form as would be approved by that agency.

The provision of the resolution, we think, is directory only and no encumbrance or legal impediment should be experienced with it. The Reconstruction Finance Corporation has been succeeded, so far as the project is concerned, by the Public Works Administration of the United States government, and a failure to secure the approval of the Reconstruction Finance Corporation would not in any way invalidate the securities.

██ The city has power, under chapter 348, Oregon Laws 1935, called the "Municipal Emergency Procedure Act of 1935", to borrow funds from a federal agency of the United States of America, as that term is defined by paragraph (f) of the act, to sell or pledge securities to such agency and to accept a grant therefrom: National Industrial Recovery Act, 15 U. S. C. A., § 701, et seq.; *Kansas Utilities Co. v. City of Burlington,* 141 Kans. 926 (44 P. (2d) 223).

Resolution No. 20691, by which the council, on June 8, 1933, adopted the plans and specifications and estimates of cost known as the Baer plans, does not prevent the city from adopting further detailed specifications, so long as they are supplemental to and not in conflict with the general plan of the sewage system as shown by

the Baer plans and adopted by the voters on July 21, 1933. The election held on July 21, 1933, authorizing a sewage disposal system, did not authorize the council to adopt and construct an entirely different system by the depositing of sewage in the Columbia river in accordance with the plans and specifications of the board of consulting engineers.

The city council is authorized under section 155 of the charter, and the statute, to require all users of the sewage disposal system, if constructed, to pay service charges therefor, and to provide for a different method of collecting delinquencies than is provided by chapter 289, Oregon Laws 1933. In other words, chapter 289 is in its nature another section of the charter of the city of Portland. It is not inconsistent with municipal law that the city charter should contain more than one section. Chapter 289 should be construed together with the sections of the charter of the city of Portland: *Pioneer Real Estate Co. v. Portland,* supra; *Carson v. Brockton Sewerage Com.,* 175 Mass. 242 (56 N. E. 1, 48 L. R. A. 277), affirmed in 182 U. S. 398 (45 L. Ed. 1151, 21 S. Ct. 860); *Brewer v. City of Point Pleasant,* 114 W. Va. 572 (172 S. E. 717); *Francis v. City of Bowling Green,* 259 Ky. 525 (82 S. W. (2d) 804).

We hold that the proceedings set forth in the answer of the city, adopting the Baer plans and specifications and calling an election, and the vote of the electors at such election, authorized the issuance of the $6,000,000 in bonds for the construction of the sewage disposal plant, in substance as provided by the Baer plans. The proceedings were sufficient without the plans thereafter submitted by the board of consulting engineers and adopted, which had no place in the proceedings and which did not change or vitiate the pro-

ceedings or the election. The city has authority to proceed with the construction of such sewage disposal plant in substantial conformity to the Baer plan.

It follows that the demurrer to the answer should be overruled, although we do not approve the adoption of the plans and specifications and estimate on July 19, 1933, which are a substantial variance and departure from those adopted by the city by resolution No. 20691 on June 8, 1933, as held by the circuit court. It appears that all of the material facts are before the court and that no testimony is necessary.

Therefore the decree of the circuit court will be reversed and one rendered in accordance with this opinion. Neither party will recover costs or disbursements in this court.

BELT and BAILEY, JJ., not sitting.