[Nos. 35265, 35603. *En Banc.* September 27, 1960.]

WILLIAM H. DAVIS, *Appellant,* v. THE CITY OF SEATTLE
et al., *Respondents.*[1]

*Alfred J. Schweppe* and *Robert R. Beezer,* for appellant.

*A. C. Van Soelen, A. L. Newbould,* and *Arthur T. Lane,*
for respondents.

FINLEY, J.—Two lawsuits questioning the legality of cer-
tain aspects of a proposed civic center development by the
city of Seattle have been consolidated for hearing, con-
sideration, and disposition in this court.

On August 13, 1956, the Seattle City Council duly pro-
mulgated Ordinance No. 85404. It provided for a bond
election to determine whether $7,500,000 in general obli-
gation bonds should be issued and financed by a tax levy
on real property, which levy would exceed the forty-mill
constitutional limitation.

[1] Reported in 355 P. (2d) 354.

Perhaps it should be emphasized at this point that the proposed bond issue was a significant step or beginning in a somewhat long-range plan for the evolution, development, or acquisition of a modern civic center for the city of Seattle and the surrounding metropolitan area.

Specifically, the bond issue was for a stated twofold purpose; *i.e.,* to finance (1) a land acquisition project (a 28-acre area within designated street boundaries); (2) a building development or construction project (contemplating (a) construction of a convention hall of approximately 3,500 seats, (b) construction of a multi-purpose auditorium of approximately 800 seats, and (c) remodeling of the existing Seattle Civic Auditorium; see Seattle Comptroller's File No. 229670). The proposal was duly publicized, and at the election of November 6, 1956, the voters of Seattle were presented with the following proposition:

"Shall Seattle issue Seven Million Five Hundred Thousand Dollars ($7,500,000.00) bonds to *acquire a Civic Center site and develop the same as recommended by the Civic Center Advisory Committee on June 26, 1956, Comptroller's File 229670 and contemplated by Ordinance 85404;* and pay the principal and interest on such bonds by an annual tax levy in excess of the millage limitation in the Constitution and State Law as contemplated by Ordinance 85405?" (Italics ours.)

The proposed (1) land acquisition and (2) building construction and remodeling program was approved by a significant vote of 137,053 to 63,752. Ordinance No. 85774, passed by the city council, provided for the issuance of the bonds; that the proceeds would be used for the purposes stated in Ordinance No. 85404, and, specifically, that "no part of the proceeds of said bonds shall be used for any purpose whatsoever other than the foregoing." The bonds, reciting their purpose as indicated above, were issued and sold.

The land acquisition program, involving the designated twenty-eight acres, was fully consummated by the city authorities. Thereupon, a troublesome dilemma developed. Approximately $4,300,000 of the original $7,500,000 was used for acquisition of the authorized land area (28 acres).

The proceeds of the bond issue then remaining were insufficient for the full consummation of the original building and construction and remodeling phase of the proposed long-range program for a modern civic center for the city of Seattle. It further developed that the original construction cost estimates were too low; that it would actually cost in excess of $4,000,000 to construct the 3,500-seat convention hall as initially contemplated. Basically, two courses of action were open to the city officials: the voters could be asked to approve a further bond issue and excess levy to provide the additional funds necessary to consummate the civic center program as originally contemplated in its entirety (both land acquisition and building construction); on the other hand, the building construction and remodeling program could be revised and curtailed—or perhaps a portion of the twenty-eight acres could be released or resold, and resultant funds diverted to the building construction phase of the program.

Actually, it was suggested, even urged in some quarters, that revision and reduction of the land acquisition program would provide the necessary additional funds. Action *either in this direction* or involving curtailment of the building construction program *would clearly constitute a deviation* from the original proposed civic center development program. Obviously, the choice was not a happy one for the city fathers. In exercising their official judgment, they decided against issuing more bonds and any further excess tax levy. Similarly, they rejected the idea of revising and reducing the land acquisition program. Ordinance No. 87661 was adopted on November 10, 1958. Its title provided:

"An Ordinance relating to the initial development of the Civic Center site acquired pursuant to Ordinances 85404, 85774 and 86033, and the intention to construct thereon a concert-convention hall within the shell of the present Civic Auditorium structure in lieu of a separate concert-convention hall for which there is insufficient funds; and to employ architects to plan such and further construction, if feasible, to be paid for out of the remaining proceeds of the bonds issued pursuant to Ordinance 85774; and to remodel and improve the Civic Ice Arena from other funds of the city in connection with such development."

Thereupon, a taxpayers' lawsuit was instituted, and an injunction obtained, restraining the city from proceeding with the altered plan in accordance with Ordinance No. 87661. Faced with this road block, the city, on July 20, 1959, promulgated Ordinance No. 88409. It provided for a referendum election on the revised plan contemplated by Ordinance No. 87661; namely, construction of an 800-seat multi-purpose auditorium, and remodeling of the existing civic auditorium as a concert-convention hall, with a seating capacity of approximately 3,100; this program to be accomplished out of approximately $3,200,000 remaining from the 1956 bond issue.

At a special election on September 29, 1959, the program, revised as contemplated by Ordinance No. 87661, was approved by the Seattle voters at a special election by 63,583 votes out of 75,580 ballots cast. Assuming the results of the special election settled any question of deviation from the original civic center development program, city officials took action to carry out the revised program. Thereupon, they were confronted with another road block. This time a taxpayer's lawsuit for an injunction on the ground that the 63,583 votes cast at the special election in favor of the revised plan fell far short of forty per cent of the 219,908 ballots cast at the last general election preceding the special election of September 29, 1959. Obviously, the underlying theory of the lawsuit was that the three-fifths-of-forty-per-cent formula of amendment 17 of the state constitution (concerning bonds and tax levies exceeding the forty mill limit) should be applied, and was controlling, in preventing the referendum election from authorizing further action on the city's revised program (Ordinance No. 87661). The trial court rejected the theory of the second taxpayer's lawsuit, and refused to enjoin further action of the city under the revised program contemplated by Ordinance No. 87661.

As indicated at the outset, the two taxpayer lawsuits are here on appeal. The question in the first lawsuit is whether the revised program contemplated by the city is an improper and illegal deviation from the original program. The

question in the second lawsuit is whether the election formula (three-fifths of forty per cent) of the seventeenth amendment to the constitution, relative to excess bond levies, is to be applied in testing the results of the referendum election of September 29, 1959.

First, as to the initial lawsuit, the rule against deviation is clearly not suggested, authorized, or imposed specifically by any language of amendment 17. Apparently it has evolved here and elsewhere through judicial decision. This, of course, would involve interpretation of constitutional language, or creative judicial policy elaboration, and implementation thereof.

*State ex rel. Traeger v. Carleton* (1954), 242 Minn. 296, 64 N. W. (2d) 776, and other cases are cited in support of the proposition that deviations as to proposed objectives or purposes in a bond financing and construction program are improper and illegal and subject to court injunction. However, a careful analysis of this and the other cases cited casts considerable doubt upon contentions which would absolutely prohibit any deviation whatsoever. In a number of the other cases cited re the deviation question, the taxing districts involved had simply decided that a change in plans or deviation was desirable. But the change or deviation was not dictated by necessity. In the *Traeger* case, circumstances developed where it was actually a practicable impossibility to carry out an original plan. The city ran short of funds raised by a bond issue for the construction of sewer facilities. It was decided to deviate from the original plans by curtailing the construction program. In an action for a writ of mandamus to require the city to construct the sewer facilities in accordance with the original plans, the Minnesota court stated that the city did not have the discretionary power to build only a part of the system and to abstain as to the rest; but, considering the insufficiency of funds, the court would not attempt a useless thing by ordering that the city consummate the original plan in its entirety. In passing, the court observed that the proper time to challenge the insufficiency of funds was before the issuance of the bonds.

In the instant case, as well as in the *Traeger* case, the city officials were faced with the problem of an insufficiency of funds. The question was not one of whim, caprice, or arbitrary official action, but one of reasonableness and sound official judgment under the circumstances involved; *i.e.*, insufficiency of funds to consummate an original plan in its entirety.

In *George v. Anacortes* (1928), 147 Wash. 242, 265 Pac. 477, where, after the proposition placed on the ballot stated that a water main would be constructed in one street, and the city thereafter undertook to place it in another street, we enjoined the deviation, saying:

" . . . The record here presents no change of situation requiring a departure from the plan, lack of feasibility, or any reason other than a desire to substitute a different plan than that submitted to the people, . . ."

So, perhaps it could be that the rule against deviation is not an absolute one; that reasonable exceptions might be made; that ample authority may exist supporting this view. Actually, it is not necessary for us to decide this question, and we refrain from doing so. As indicated hereinafter, the question as to deviation is moot if the referendum election and its outcome and result are legally supportable.

Now as to the latter problem: Seattle officials in their discretion decided against asking the voters to approve more bonds and a further excess tax levy on real estate to provide the necessary additional funds to complete the original civic center development program in its entirety. If their decision had been to the contrary, then obviously amendment 17 of the constitution would have been involved. The three-fifths-of-forty-per-cent election formula would have clearly applied in order to validate any additional bond issue involving further taxation in excess of the forty-mill limit. But, as stated above, the decision of the city officials did not involve the issuance of additional bonds and the imposition of a further excess tax levy. The bonds involved had been validly authorized. They had

been issued and sold. The question simply involved expenditure of the proceeds from the sale of such bonds.

■ It is significant and bears repetition that amendment 17 does not by its terms explicitly require, after an excess levy has been approved by the voters and the bonds have been issued, that any change in plans not only be submitted to the voters for their approval or rejection, but inexorably must be tested by the excess tax levy election formula.

The three-fifths-of-forty-per-cent formula is a more than usually severe standard for testing bond financing excess tax levy election results. It can safely be said that the formula was designed to be particularly severe as a protection against too easy accomplishment or imposition of excess levy tax burdens. In only one other related situation does the state constitution require anything greater than a simple majority vote. Article VIII, § 6, requires an affirmative vote of three fifths of those voting in an election to authorize exceeding the limitation on total municipal indebtedness.

The severity of the amendment 17 formula, and the consequent suggestion that its purpose is to protect against excess tax levies and not to regulate the more routine matter of the use of funds for which the tax obligation is inevitable, may be illustrated by comparing the situation where issuance of bonds will not result in exceeding the forty-mill limit. The controlling statutory provision with respect to first class cities is RCW 35.22.280:

"Any city of the first class shall have power—

" . . .

"(4) To borrow money for corporate purposes on the credit of the corporation, and to issue negotiable bonds therefor, on such conditions and in such manner as shall be prescribed in its charter; . . ."

The pertinent provision of the Seattle Charter, Art. IV, § 14, reads, in part:

"The city council shall have power by ordinance and not otherwise—

" . . .

" . . . To borrow money for corporate purposes on

the credit of the city and to authorize the issue of bonds in the manner prescribed by law . . ."

No election, no affirmative vote even by a simple majority, is required for a bond issue that will not cause the city to exceed the forty-mill limit.[2] Unquestionably, the purpose of amendment 17 was to provide protection to property owners by way of a severe restraint (the three-fifths-of-forty-per-cent excess levy election formula) against the imposition of excessive taxes, while at the same time allowing considerable latitude for unhindered financing within reasonable—forty mill—limits. Once the increase in taxes exceeding the forty-mill limit has been approved, and the taxing district has obligated itself to bondholders or potential bondholders, the full protection of amendment 17 has operated for the benefit of taxpayers, and there is no reason or authority for requiring another invocation of the three-fifths-of-forty-per-cent formula in another and different context.

Reference has been made to the general principle of law that a measure approved by the voters cannot be changed by another public body; *i.e.*, the measure can be changed by no less authority than that which called it into being. *Stetson v. Seattle* (1913), 74 Wash. 606, 134 Pac. 494; *State ex rel. Knez v. Seattle* (1934), 176 Wash. 283, 28 P. (2d) 1020, 33 P. (2d) 905; *State ex rel. Pike v. Bellingham* (1935), 183 Wash. 439, 48 P. (2d) 602; *State ex rel. Leo v. Tacoma* (1935), 184 Wash. 160, 49 P. (2d) 1113; *State ex rel. Ausburn v. Seattle* (1937), 190 Wash. 222, 67 P. (2d) 913, 111 A. L. R. 418. This argument confuses the matter of election mechanics with the comparative powers of the people and of a governmental body acting in its representative capacity. There is no basis for application of the rule in the instant case for the simple but very telling reason that the curtailed building plan was, in fact, submitted to the voters

[2]*Cf.*, on the analogous matter of exceeding the limitation of municipal indebtedness, Letters of the Attorney General of Washington to Mr. J. C. McCoy, September 12, 1935; Hon. Cliff Yelle, November 18, 1933; Hon. J. W. Hoover, August 26, 1926; 1945-46 Opinions of the Attorney General of Washington 128.

to obviate any possible conflict between the authority or *power* of the people and their views and the *power* of the city council and its views.

The submission was done in the only manner possible—by referendum. The mechanics of elections in the city charter applied and were controlling. Under Art. IV, § 1M of the Seattle Charter, a majority of the votes cast determines the issue. There was no election on more bonds and an additional tax levy exceeding the forty-mill limit; so the constitutionality prescribed mechanics for such a bond election simply were not applicable. There is no rhyme or reason to lift the three-fifths-of-forty-per-cent formula, applicable to excess levy bond elections, completely out of context and say it is applicable and controlling in a referendum election which has its own election mechanics or formula for testing or determining the outcome of the referendum.

For the foregoing reasons, we are convinced that the judgment of the trial court in the second action, Cause No. 35603, should be affirmed; and that this makes the issues moot in Cause No. 35265.

WEAVER, C. J., MALLERY, DONWORTH, and HUNTER, JJ., concur.

ROSELLINI, J. (dissenting)—The questions presented by the appeal in case No. 35265 are: (1) When a proposed plan to issue bonds for a specified purpose which involves an excess levy of taxes, has been submitted to the electors of a taxing district in accordance with the requirements of amendment 17 of the state constitution, and has gained the approval by the percentage of votes designated in that amendment, can the plan thus submitted and approved be altered in a material aspect without the assent of the electors; and (2) does the substitution of a new concert-convention hall, with a seating capacity of approximately 3,100 to be built within the shell of an existing auditorium, constitute a material alteration of a plan which called for the construction of a new concert-convention hall with a seating capacity of about 3,500 and the modernization and

remodeling of the existing auditorium, the seating capacity of which is 6,500?

It is well settled that municipal taxes levied for one purpose ordinarily cannot be applied by the municipality to another purpose. *Thompson v. Pierce County,* 113 Wash. 237, 193 Pac. 706; *Haraway v. Zambie,* 203 Ark. 550, 157 S. W. (2d) 504; *McFarland v. Town of Bourbonnais,* 339 Ill. App. 328, 89 N. E. (2d) 849; *Davis v. Laughlin,* 147 Iowa 478, 124 N. W. 876; *Chamberlain v. City of Tampa,* 40 Fla. 74, 23 So. 572. 4 Cooley, Taxation (4th ed.) 3572, § 1819; 16 McQuillin, Municipal Corporations (3d ed.), 470-71, § 44.186; 64 C. J. S. § 2119.

It is equally well established that the proceeds of bonds may be used for the purpose authorized by vote, but not for a different purpose, nor for a more limited purpose involving a system radically different from that contemplated by the voters. *Thompson v. Pierce County, supra*; *State ex rel. Traeger v. Carleton,* 242 Minn. 296, 64 N. W. (2d) 776; *Middlesex Concrete Products & Excavating Corp. v. Borough of Carteret,* 28 N. J. 208, 145 A. (2d) 786; *McNichols v. City & County of Denver,* 120 Colo. 380, 209 P. (2d) 910; *Shainwold v. Portland,* 153 Ore. 167, 55 P. (2d) 1151; *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S. W. (2d) 975; *Texsan Service Co. v. City of Nixon,* (Tex. Civ. App.) 158 S. W. (2d) 88; 64 C. J. S. 551, § 1929. In accord, although dealing with revenue bonds (as opposed to general obligation bonds), is *Hayes v. Seattle,* 120 Wash. 372, 207 Pac. 607.

This rule applies, even though, as in this case, it is impossible to carry out the project as it was approved by the electors. *State ex rel. Traeger v. Carleton, supra.*

The appropriateness and justice of the rule, as applied to the facts of this case, are inescapable. The framers of our constitution placed a limit on the amount of tax which a taxing district could levy against the property of the owners therein, without the express authorization of the electors. Amendment 17 provides that such authorization can only be obtained by a favorable vote of three fifths of the electors casting ballots in an election at which the total

number of ballots cast is not less than forty per cent of the total cast at the last preceding general election. Whether an excess levy can be imposed is a matter which the electorate must decide, acting through a specified majority, and if they authorize such a levy for a specific purpose, the taxing body (in this case the city council) has no authority to use the proceeds for any other purpose without the consent of the electors.

The defendants point to statutory provisions giving the city power to acquire sites for, and to construct thereon, municipal auditoriums and other public buildings; and they argue that it must necessarily follow that they have discretion in these matters. This same argument was made in *Hayes v. Seattle, supra,* and was thus aptly answered:

"Appellant quotes from a number of our cases where we have held that we will not, in the absence of fraud or arbitrary action, review proceedings taken by municipal authorities under a discretion lawfully given. We are not here reviewing a discretionary action which the city council has a right to exercise; we are holding that it has no power to exercise the discretion it is here undertaking to exercise—it is not a question of abuse of discretion, but one of power."

Of course the governing body of the city has discretion in the selection of plans and design and in the construction of an auditorium or concert hall if the funds to be used are derived from ordinary revenues within the forty-mill limit; but when, in order to build such structures, it must ask the people for authority to levy an excess tax for the purpose, it has no discretion to substantially change the project which they have approved. In accord is *State ex rel. Traeger v. Carleton, supra.*

The defendants say that it was not necessary to submit to the voters a plan as detailed as that which was submitted, and that if the ballot title had been couched in broader terms, they would have had authority to do that which they now seek to do. This may be true, but this court cannot assume that such a broad authorization would have been given by the voters; and in any event, the authorization which they actually gave was specific.

The trial court found that the proposed change was substantial and constituted a material deviation from the plan approved by the voters. I think the correctness of this determination cannot be seriously questioned. The proposal submitted to the voters and approved by them called for the construction of a new concert-convention hall and the remodeling and modernization of the existing auditorium. Under the proposed change, the auditorium would be converted into a concert and convention hall, and the existing auditorium facilities would be destroyed. A vast reduction in seating capacity would be effected. This is not a minor alteration or a change of detail which the city may make without express authorization, but is an entirely different project—one which the electors who approved the bond issue and tax levy may not approve at all.

I am convinced that the defendants had no power to use any part of the bond fund for the construction of a concert-convention hall within the shell of the existing auditorium unless they obtained the consent of the electorate.

Now comes the question presented in the second case (No. 35603): Can a substantial change in the use approved by the voters be authorized by a simple majority of those voting in an election at which the total ballots cast are less than forty per cent of the number cast at the last preceding general election; in other words, does the mandate of amendment 17 apply when a change in authorization is sought? The majority opinion holds that it does not. I am unable to agree.

The conclusion of the majority is that since this election did not involve the actual levying of an excess millage tax, a simple majority of the votes cast was sufficient. It cites the referendum provisions of the city charter, and states that these provisions are controlling. Art. IV, § 1-A, provides that the legislative powers of the city shall be vested in a mayor and city council, and further provides generally for the initiative and referendum. Section 1-H provides for the referendum as to any ordinance which has passed the city council and mayor "acting in their usual prescribed manner as the ordinary legislative authority of the city."

These provisions of the charter, of course, provide for the enactment of local legislation which is *within the power of the legislative body*. If the position of the majority is correct, a measure which the mayor and council have no power to enact (in this instance, an ordinance amending the voters' authorization to levy an excess tax) may be brought within that power by the simple expedient of applying to the election the requirements of the charter referendum instead of those imposed by amendment 17 of the constitution. The fallacy in this is that the charter does not give to the voters the power to enact ordinances which are beyond the power of the council to enact in the first instance.

If the referendum provisions of the charter govern, and only a majority of votes cast in the election are required, then it must be held that the people have the power, under the charter, to enact ordinances which a mayor and council cannot enact, and nowhere in the charter or in law do we find such a provision. Amendment 17 gives such a power, but it also prescribes the percentage of votes which must be cast in order to exercise that power. An ordinance can be amended only by the body which has the power to pass it. 62 C. J. S. 832, § 434 b.

While this court has not had before it the precise question presented in this case, it has consistently held that, under charter provisions for reference of a measure to the voters, if the referred measure is adopted by the voters, it cannot subsequently be altered, amended, or repealed by any public body, but can be changed or altered only by no less authority than that which called it into being. *State ex rel. Ausburn v. Seattle*, 190 Wash. 222, 67 P. (2d) 913, 111 A. L. R. 418; *State ex rel. Leo v. Tacoma*, 184 Wash. 160, 49 P. (2d) 1113; *State ex rel. Pike v. Bellingham*, 183 Wash. 439, 48 P. (2d) 602; *State ex rel. Knez v. Seattle*, 176 Wash. 283, 28 P. (2d) 1020, 33 P. (2d) 905; *Stetson v. Seattle*, 74 Wash. 606, 134 Pac. 494.

In this case, that authority is three fifths of the electors voting in an election in which the total number of ballots cast is not less than forty percentum of those cast in the last preceding general election.

It is true, as stated by the majority, that there is no actual levy of taxes involved in the decision to change the use of the bond fund. I do not think, however, that this fact renders the constitutional provision inapplicable. If the rule that a change cannot be made without the authorization of the voters means anything at all, it means that the question must be referred back to those who authorized the levy, and their approval must be voiced with the same authority. While amendment 17 does not expressly require that an amendment to a special levy be approved in the same manner as the original levy, this requirement is found in the rule of law and is consistent with the dictates and in harmony with the spirit of that provision of the constitution.

I would affirm the judgment in case No. 35265, and reverse it in case No. 35603.

HILL, OTT, and FOSTER, JJ., concur with ROSELLINI, J.

--------

November 18, 1960. Petition for rehearing denied.