**CITY OF DALLAS, Appellant,**

v.

**James Randell HUGHES, Appellee.**

**No. 05–10–00511–CV.**

Court of Appeals of Texas, Dallas.

June 14, 2011.

---

Julie A. Essenburg, Barbara E. Rosenberg, Patricia M. Medrano, City of Dallas Atty's. Office, Dallas, for Appellant.

Mark Frels, Buddy Apple, Mark H. How, How, Frels, Rohde, Woods & Duke, P.C., Dallas, for Appellee.

Before Justices MURPHY, FILLMORE, and MYERS.

## OPINION

Opinion By Justice MURPHY.

Appellee James Randell Hughes sued the City of Dallas under a premises-liability theory for injuries he sustained when he was thrown from his bicycle as he attempted to "jump" protruding wooden planks on a bridge on the White Rock Lake hiking-biking trail. The City appeals the denial of its plea to the jurisdiction, contending Hughes cannot establish the City's gross negligence necessary for a premises-liability claim under the Texas Recreational Use Statute and the Texas Tort Claims Act (TTCA). We reverse the trial court's order and dismiss Hughes's action for lack of subject-matter jurisdiction.

## BACKGROUND

Hughes's accident happened sometime before seven o'clock on Monday morning, July 2, 2007. He was riding his bicycle on the White Rock Lake hiking-biking trail in Valley View Park, located at the northeast corner of LBJ Freeway and Hillcrest Road in Dallas. Hughes had ridden the trail many times. Traveling at a speed of approximately eighteen miles per hour, Hughes encountered two protruding wooden planks at the far side of an arched bridge. The planks had buckled, forming an "A" shape and spanning the width of the bridge. The buckled planks had been spray painted orange; otherwise, there were no signs warning of the condition. According to Hughes, he saw the protrusion from approximately ten to twelve feet away; the bridge was wet, and he could not stop, so he attempted to jump over the slats. His back tire caught on the protrusion and Hughes was thrown from his bicycle. He dislocated his clavicle and suffered other injuries.

Hughes filed suit against the City of Dallas, which owned, operated, and maintained the trail as part of a recreational park. Hughes later amended his petition to assert a claim of gross negligence under the TTCA and the recreational-use statute, claiming the City failed to repair or warn of the defect on the bridge. Asserting governmental immunity, the City filed pleas to the jurisdiction. Both parties presented evidence, some of which was contested. After a hearing in which no additional evidence was presented, the trial court denied the City's plea. This interlocutory appeal followed.

## STANDARD OF REVIEW

■ We review de novo a challenge to the trial court's subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004); *Perez v. City of Dall.*, 180 S.W.3d 906, 909 (Tex. App.-Dallas 2005, no pet.). When a plea to the jurisdiction challenges the pleadings, we look to whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Miranda*, 133 S.W.3d at 226 (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993)); *City of Dall. v. Heard*, 252 S.W.3d 98, 102 (Tex.App.-Dallas 2008, pet. denied). We liberally construe the plaintiff's pleadings in favor of jurisdiction, and we look to the plaintiff's intent. *Miranda*, 133 S.W.3d at 226.

■ Where, as here, the City's plea challenges the existence of jurisdictional facts, we must consider relevant evidence to resolve the jurisdictional issues. *Id.* at 227. In such case, we are not bound by the plaintiff's factual allegations. *See id.* at 224 n. 4. This standard mirrors our summary-judgment standard under Texas Rule of Civil Procedure 166a(c) and places the burden on Hughes, as the plaintiff, to allege facts that affirmatively demonstrate

the trial court's jurisdiction. *Id.* at 227–28. Once he has done so, the City must meet the summary-judgment standard of proof to support its contention the trial court lacks subject-matter jurisdiction. *Id.* at 228. Hughes is then required to show only that a disputed fact issue exists. *Id.; Heard*, 252 S.W.3d at 102. If the relevant evidence fails to raise a fact question or is undisputed on the jurisdictional issue, we determine the plea as a matter of law. *Miranda*, 133 S.W.3d at 228.

## APPLICABLE LAW

■ Governmental immunity protects political subdivisions of the State, including cities, counties, and school districts, from suit and liability. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex.2004); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 & n. 3 (Tex.2003); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 101.001(3)(B) (West 2005) (defining "governmental unit" to include cities). Immunity from suit deprives a court of subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 224.

■ The legislature created a limited waiver of immunity from suit under the TTCA, permitting actions against governmental units in three circumstances—for injuries caused by (1) the operation or use of publicly owned vehicles or equipment, (2) a condition or use of tangible personal or real property, and (3) premises defects. TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021, 101.025(a) (West 2005), § 101.022 (West Supp. 2010). A plaintiff must plead sufficient facts to invoke a waiver of immunity under the TTCA. *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002). The type of duty owed a plaintiff is part of the waiver analysis. TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021 & 101.022. In premises-defect cases, the governmental unit owes "only the duty that a private person owes to a licensee on private prop-

erty, unless the claimant pays for the use of the premises." *Id.* § 101.022(a).

■ The TTCA further modifies a governmental unit's waiver of immunity from suit by imposing the liability limitations prescribed in the recreational-use statute. *Miranda*, 133 S.W.3d at 225 (citing TEX. CIV. PRAC. & REM.CODE ANN. § 101.058). The Texas Recreational Use Statute limits the governmental unit's liability as a premises owner if the plaintiff engages in recreation on the premises. TEX. CIV. PRAC. & REM.CODE ANN. §§ 75.001–.021, 75.004 (West Supp. 2010), § 75.003 (West 2005); *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 659–60 (Tex.2007). In such a case, chapter 75 controls over the TTCA and limits a city's duty to that owed a trespasser. TEX. CIV. PRAC. & REM.CODE ANN. §§ 75.003(g) (chapter 75 controls over chapter 101 to extent chapter 75 limits liability of governmental unit under circumstances in which governmental unit would be liable under chapter 101); 101.058 (West 2005) (same); 75.002(c)(2), (f) (duty owed to trespasser). Thus, when applicable, the recreational-use statute operates to raise the plaintiff's burden to show gross negligence, malicious intent, or bad faith. *Id.* § 75.002(d); *Flynn*, 228 S.W.3d at 659; *City of Bellmead v. Torres*, 89 S.W.3d 611, 615 (Tex.2002). Here, the parties agree the recreational-use statute is applicable. Additionally, our analysis involves only the standard for gross negligence—the City based its plea to the jurisdiction on gross negligence, and Hughes argues no other basis for waiver of immunity.

■ Gross negligence is "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or

welfare of others." *State v. Shumake*, 199 S.W.3d 279, 287 (Tex.2006) (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21 (Tex. 1994)). Gross negligence, as applied under the recreational-use statute, involves two components: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of risk involved, but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others. *See Miranda*, 133 S.W.3d at 225.

## ANALYSIS

In six issues, the City argues the trial court erred in denying its plea to the jurisdiction because Hughes did not raise a material fact question as to gross negligence. Hughes alleged in his amended petition that the City's "conduct in failing to make any effort to repair the Bridge, after having actual knowledge of the defective condition, along with [the City's] failure to provide any warning as to the defect on the Bridge, constitutes gross negligence." The City does not challenge Hughes's pleadings. Nor does Hughes challenge the sufficiency of the City's evidence to sustain its burden of proof as to the court's subject-matter jurisdiction.[1] The question before us is whether Hughes raised a fact question that the City actually knew about an extreme degree of risk, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others. *Id.*

To answer that question, Hughes focuses primarily on five paragraphs from his affidavit, which was filed in support of his response to the City's plea, related to communications with a City employee, Tim

1. Hughes does argue his pleading allegations control over the evidence, which is an incorrect statement of the law. *See Miranda,* 133 S.W.3d at 224 n. 4.

Ray, who arrived at the park soon after the accident:

9. Following the accident, I began to call my wife and the City of Dallas, beginning at approximately 7:45 AM, thereafter, at about the same time, my wife and a City of Dallas Parks employee named Tim Ray arrived on the scene of the accident. . . .

10. Both my wife and I heard Mr. Ray state that the City and his office had received a number of calls and complaints about the Bridge and Defect over the weekend and that he was on the scene of the accident to tape off the bridge to prevent access while he fixed the Defect. Mr. Ray was not responding to the accident, but responding to the complaint calls.

11. Mr. Ray also stated that someone else had been hurt on the Bridge that weekend as well.

12. I asked Mr. Ray why they didn't come out over the weekend and tape the bridge off in order to prevent further bikers or pedestrians from being subject to the Defect, and Mr. Ray stated that the Parks Department did not work on the weekends.

13. At the time of the accident, there were no warning signs of any kind at or near the Bridge.

In addition to his affidavit, in which he claims Ray said there had been "a number of calls and complaints" and "that someone else had been hurt on the Bridge that weekend,"[2] Hughes relies on (1) a photograph of the bridge, which shows two wooden slats buckled into an "A" shape approximately two to three inches high and spray painted orange; (2) deposition testimony from Ray that the wood used by the City to repair bridges is purchased on

contract, "whoever bids the cheapest on it is what we get," and the wood does not "last as long [as pine]"; (3) evidence that parks department employees do not work on weekends; and (4) testimony that the City knew buckling of bridge planks was common after heavy rains.

For purposes of our analysis, we assume the truth of the facts asserted in Hughes's affidavit and indulge all reasonable inferences in Hughes's favor. *Miranda,* 133 S.W.3d at 228. Having reviewed the record under this standard, we conclude Hughes failed to raise a fact question as to gross negligence.

### Weekend Work and "Cheap" Wood

As evidence of the City's conscious indifference under the gross-negligence standard, Hughes relies in part on testimony the City uses the lowest bidders to purchase wood and the lack of weekend park staff. The City argues that its decisions regarding whether to staff parks with workers on the weekend and what types of materials to use in bridges are discretionary decisions for which the City retains governmental immunity. On this record, we agree.

■■■ The legislature created exceptions to the TTCA's limited waiver of immunity. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 101.051–.066 (West 2005), § 101.067 (West Supp. 2010). Under section 101.056, a city's immunity is preserved not only for its discretionary or public-policy decisions, but also for its failure to act when no particular action is required by law. *See id.* § 101.056; *Flynn,* 228 S.W.3d at 657; *see also Todaro v. City of Hous.,* 135 S.W.3d 287, 294 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (analy-

---

2. The City objected to Hughes's affidavit as to Ray's statements on the basis of hearsay. The trial court overruled the objection, and the

City complains on appeal that such ruling was error. Based on our resolution of this appeal, we do not reach this question.

sis of city's liability does not reach recreational-use statute until claims fall under TTCA waiver of immunity). An act that requires the exercise of judgment is discretionary, and the law does not mandate performance with such precision that nothing is left to discretion or judgment. *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex.1999) (per curiam), *abrogated on other grounds by Denton Cty. v. Beynon*, 283 S.W.3d 329, 331 n. 11 (Tex.2009). The discretionary-function exception of section 101.056 is designed to "avoid judicial review of governmental policy decisions." *Perez*, 180 S.W.3d at 911. Thus, if a plaintiff's injury results from the formulation of a policy, the governmental unit is immune from liability. *Id.* A governmental unit is not immune from liability, however, if a plaintiff's injury is caused by the negligent implementation of that policy or the negligent maintenance of the premises. *Id.; see also Flynn*, 228 S.W.3d at 657–58 (university not immune for operational- or maintenance-level decisions). Whether a particular governmental activity is discretionary and within the exception to the waiver of immunity is a question of law. *Flynn*, 228 S.W.3d at 657.

■ The record contains uncontested evidence that, at the time of Hughes's accident, no park employees worked on weekends unless overtime was approved in advance. Further, Hughes relies on Ray's testimony that the City purchased wood from the lowest bidders. Ray's only complaint was that the wood did not last as long as, for example, pine wood. Hughes does not suggest, nor is there any evidence, that whatever wood is purchased by the City, either generally or specific to this incident, fails to meet contract-bidding specifications or requirements. Additionally, Hughes does not argue his injury was caused by the negligent implementation of a policy of not paying overtime for week-

end workers or purchasing goods by contract to the lowest bidder. Rather, he characterizes the City's decisions as maintenance. Given the limited resources a city must allocate, decisions to limit overtime for park employees and to purchase supplies based on a low-bidder process are precisely the kinds of governmental policy decisions that are not judicially reviewed. *See Perez*, 180 S.W.3d at 911 (discretionary-function exception designed to avoid judicial review of governmental policy decisions); *see also City of Corsicana v. Stewart*, 249 S.W.3d 412, 416 (Tex.2008) (per curiam) ("[T]he City is immune from liability for discretionary decisions concerning the expenditure of limited resources for the safety of its citizens.") (citing TEX. CIV. PRAC. & REM.CODE ANN. § 101.056(2)). Hughes has pointed to no legal authority to support an argument these were non-discretionary decisions, and we have found none.

### City's Knowledge of Bridge Condition

Turning to the knowledge component of gross negligence, Hughes relies primarily on his affidavit, and specifically paragraphs nine through thirteen quoted above, to show the City knew the bridge was defective at the time of the accident. He attested that Ray, a park employee, arrived at the bridge soon after the accident and stated that the City had received a number of calls and complaints about the bridge and "defect" during the weekend and that someone else had been hurt on the bridge that weekend. Hughes also attested Ray was at the bridge to respond to the complaint calls. Hughes adds in his argument that the orange spray paint on the protruding planks is evidence the City was aware of the problem and elected to paint, rather than repair, the boards.

■ Assuming that complaints were received by the City during the weekend,

the existence of such complaints does not create a fact issue on the record before us as to the City's alleged gross negligence. The uncontroverted evidence showed that complaints received over the weekend would be left on voice mail and retrieved at seven o'clock the following Monday morning. The telephone number for the parks department district was posted throughout the park. Because no employees worked during the weekend, a fact that Hughes emphasizes, all messages left on voice mail during the weekend would have been retrieved at seven o'clock Monday morning. At that time, work orders would be issued and park employees would be dispatched to handle the work orders. The City also had a 311 customer service telephone number. Information from calls made to the City using this service would be faxed or e-mailed to the supervisor or manager of the appropriate department for issuance of work orders. Hughes's testimony confirms that he was unable to contact the City about his accident, absent an emergency 911 call, because the office "wasn't open."

Similarly, City employees testified they arrive in the office early to start work by seven o'clock. Ray had been with the parks department for eighteen years at the time of Hughes's accident. He was a crew chief for his district and his typical day included writing work orders to crews from 311 calls and from issues other supervisors had seen and reported, delegating work to make sure the jobs were done, and going out with crews to complete the work orders. Ray testified that he arrived at work between 6:20 and 6:30 the morning of Monday, July 2.

In addition to the City's procedures for retrieving voice mails and issuing work orders, the uncontroverted testimony also showed that it was normal after a rain to walk the trail in this district to check for silt buildup from the creek. One park employee testified it is the City's number one priority after a lot of rain to check the trail, to start cleanup, and to check the bridges to ensure they are safe. The supervisor for this district testified the trail is inspected at least once a week and that repair of the wood bridge slats is an ongoing process. Hughes confirmed in his affidavit that park employees had arrived first thing Monday morning to repair the bridge. By his own admission, Hughes did not call 911 or seek emergency medical assistance for his accident. Assuming the truth and admissibility of Hughes's affidavit regarding the City's knowledge of any weekend complaints or an injury, no dispute exists that park employees would have become aware of any such complaints at about seven o'clock on Monday morning and workers were dispatched to the site that morning as a priority to inspect and repair the bridge.

### Extreme Degree of Risk

■■■■ Gross negligence involves not only actual knowledge of a risk, but knowledge of an extreme degree of risk, considering the probability and magnitude of potential harm to others. *Miranda,* 133 S.W.3d at 225; *see also Moriel,* 879 S.W.2d at 22 ("extreme degree of risk" for gross negligence not satisfied by remote possibility of injury or high probability of minor harm, but rather "likelihood of serious injury"). Even if there were evidence the City actually became aware during the weekend of complaints about the bridge or that an injury had occurred, that disclosure alone does not necessarily impute knowledge of an extreme risk creating the likelihood of a serious injury. *See Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993). Assuming the truth of Hughes's affidavit that an accident occurred that weekend, the evidence is undisputed that the City had no notice of any

other accidents or injuries. Additionally, Hughes does not claim there had been other accidents or that he has any evidence about the nature of the one alleged injury occurring over the weekend. Based on this record, knowledge of this one incident alone, without more, is insufficient to show gross negligence. *See, e.g., id.* (one person stumbling over ridge insufficient to show extreme risk creating likelihood of serious injury).

■ Nor is the City's "expectation of damage after heavy rainfall," as argued by Hughes, evidence of knowledge of an extreme degree of risk on the day of Hughes's accident. "Awareness of a potential problem is not actual knowledge of an existing danger." *Reyes v. City of Laredo,* 335 S.W.3d 605, 609 (Tex.2010) (per curiam). As emphasized by the Texas Supreme Court in *Reyes,* "[h]ad there been testimony that a 911 operator received a credible report at about the time of the accident that the crossing had actually flooded and was imperiling motorists, there would have been evidence the City had actual knowledge of a dangerous condition." *Id.; see also Stewart,* 249 S.W.3d at 414–15 ("Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time."); *City of Dall. v. Thompson,*

210 S.W.3d 601, 603 (Tex.2007) (per curiam) (that materials deteriorate over time and may become dangerous does not itself create a dangerous condition; actual knowledge required for liability is of dangerous condition at time of accident, not merely possibility dangerous condition can develop); *Prairie View A & M Univ. v. Brooks,* 180 S.W.3d 694, 707 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (actual knowledge requires finding State knew of dangerous condition that caused injury, not just proof State aware of related condition creating danger); *cf. Brookshire Grocery Co. v. Taylor,* 222 S.W.3d 406, 408 (Tex.2006) ("A condition is not unreasonably dangerous simply because it is not foolproof.").

Given the regular inspections and repair, the City's prompt attention to the bridge early Monday morning after heavy rains, and the lack of evidence of any prior serious injury, we cannot conclude, as argued by Hughes, that the City's expectation of damage after heavy rains raises a fact issue that the City was aware of an extreme degree of risk and consciously ignored the risk. *See, e.g., Howard v. E. Tex. Baptist Univ.,* 122 S.W.3d 407, 412 (Tex.App.-Texarkana 2003, no pet.) (although employees knew diving board's fulcrum would shift, shifting never caused problems suggesting risk to divers and fulcrum would be repositioned whenever periodic inspection revealed shifting).[3]

---

**3.** Hughes argues that the City must have painted the boards, which was further evidence of the City's knowledge of the alleged defect and conscious indifference that the City chose not to repair the boards. Not a single person testified that the City sprayed orange paint on the protruding boards. City employees testified they did not paint the boards. The supervisor for parks and recreation in the district testified there was "no possibility" the City would have painted the slats as a warning instead of repairing them. He also testified that if the park crew had known there was a problem late Friday afternoon, they would have called to request overtime for repairs. The only testimony suggesting the origin of the paint was Ray's speculation a biker could have painted the boards. Nevertheless, assuming without deciding that this record allows an inference, as suggested by Hughes, that it was the City that painted the boards, this inference does not change the Court's analysis. Knowledge is not sufficient; the City must be actually aware of a condition that poses an extreme degree of risk. *See Miranda,* 133 S.W.3d at 225.

### Warning Signs

■ Hughes also argues that the City's failure to erect signs, either in compliance with subsection 75.002(g) of the civil practice and remedies code or generally warning of the bridge condition, was evidence of the City's conscious indifference. Subsection 75.002(g) mandates warnings of a governmental unit's limited liability only for identified activities, as follows:

Any premises a governmental unit owns, operates, or maintains and on which the recreational activities described in Subsections (e)(1)-(4) [hockey and in-line hockey; skating, in-line skating, rollerskating, skateboarding, and roller-blading; soap box derby use; and paintball use] are conducted shall post and maintain a clearly readable sign in a clearly visible location on or near the premises. The sign shall contain the following warning language:

TEXAS LAW (CHAPTER 75, CIVIL PRACTICES AND REMEDIES CODE) LIMITS THE LIABILITY OF A GOVERNMENTAL UNIT FOR DAMAGES ARISING DIRECTLY FROM HOCKEY, IN–LINE HOCKEY, SKATING, IN–LINE SKATING, ROLLER–SKATING, SKATEBOARDING, ROLLER–BLADING, PAINTBALL USE, OR SOAP BOX DERBY USE ON PREMISES THAT THE GOVERNMENTAL UNIT OWNS, OPERATES, OR MAINTAINS FOR THAT PURPOSE.

WARNING

TEX. CIV. PRAC. & REM.CODE ANN. § 75.002(g). The record contains no evidence or allegations that the listed recreational activities were occurring in Valley View Park. In addition, Hughes fails to explain how the statutory warning would apply to his cycling activity or how warning him of the City's limited liability for other activities evidences the City's conscious disregard of an alleged extreme risk to Hughes on the date of his injury. We conclude on this record that the lack of a warning sign under subsection 75.002(g) is inapplicable to Hughes's gross-negligence claim.

Hughes also argues he has created a fact question as to the City's conscious indifference because of the City's failure to erect a warning both as to the specific condition at the time of his accident as well as the "potential for twisted or protruding [p]lanking generally, or after heavy rains." As to the potential for buckling, no warning is required by law. Only the condition existing at the time of Hughes's injuries—the alleged defect—is relevant to our analysis. *See Shumake*, 199 S.W.3d at 288 (premises-defect claim may be brought under recreational-use statute "as long as there existed a factual dispute regarding the landowner's gross negligence *with respect to the alleged defect* ") (emphasis added); *City of Austin v. Leggett*, 257 S.W.3d 456, 470 (Tex.App.-Austin 2008, pet. denied) ("The supreme court has repeatedly held that the relevant unreasonably dangerous condition in a premise liability case is generally the condition at the time and place injury occurs. . . ."). We therefore consider the condition existing at the time of Hughes's accident.

■ "[T]he recreational use statute does not obligate a landowner to warn of known conditions." *Flynn*, 228 S.W.3d at 660. A landowner could be liable, however, for gross negligence in creating and failing to warn of "a condition that a recreational user would not reasonably expect to encounter on the property in the course of the permitted use." *Shumake*, 199 S.W.3d at 288. Hughes was an experienced cyclist who had been riding for over twenty years. He testified that he used that specific bridge fifty percent of the time he would ride in Valley View Park,

which he estimated to be once every two weeks. Hughes also testified that the bridge had been "taped off from time to time" and he tried to stay away from the trail because it had so many problems "over the years." He also testified he previously had "seen the bridge with those wood slats, you know, kind of be up and down a little." He added that on this occasion, the two boards "were kicked up into pretty much a perfect V and got so high above the deck area that you just couldn't jump it. But that's the only option I really had left at the time I saw it." He also testified the boards were "saturated" with water on the morning of his ride. The photograph of the condition here, taken by Hughes's wife immediately after the accident, showed two wooden planks that buckled into an "A" shape, or an inverted "V," to a raised height of approximately two to three inches.

■ Texas cases addressing special defects are instructive in our analysis of conditions such as the one depicted here. Both premise- and special-defect claims are recognized under the TTCA, and the proof required to establish a breach of the duties owed for each claim depends on the type of defect alleged. TEX. CIV. PRAC. & REM.CODE ANN. § 101.022; *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992) (op. on reh'g). The court decides as a matter of law the question of whether a condition is a premise defect or a special defect. *Payne*, 838 S.W.2d at 238. The legal distinction between a premise defect and a special defect lies in the duty owed by a city to the person injured. *City of Dall. v. Reed*, 258 S.W.3d 620, 622 (Tex.2008) (per curiam) (citing *Payne*, 838 S.W.2d at 238).

■ A "special defect" is not defined by the TTCA, but the legislature identified representative, non-exclusive examples "such as excavations or obstructions on highways, roads, or streets." TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b). In determining whether a condition is within the same class of special defects as excavations or obstructions, courts should consider, among other things, whether the condition presents an unexpected and unusual danger to ordinary users of roadways. *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 847 (Tex.2009) (per curiam) (op. on reh'g).

In *City of Dallas v. Reed*, a special-defect case, the supreme court concluded that "there is nothing unusually dangerous about a slight [two-inch] drop-off between traffic lanes in the roadway" because "[o]rdinary drivers, in the normal course of driving, should expect these slight variations on the road caused by normal deterioration." *Reed*, 258 S.W.3d at 622; *see also City of El Paso v. Bernal*, 986 S.W.2d 610, 611 (Tex.1999) (per curiam) (three-inch depression in sidewalk was not "unexpected or unusual" danger to ordinary users); *cf. Hindman v. State Dep't of Highways & Pub. Transp.*, 906 S.W.2d 43, 45 (Tex.App.-Tyler 1994, writ denied) ("[M]inor flaws in road shoulders are neither unexpected nor unusual, and, though Hindman, as a cyclist, had a perfect right to be traveling on the shoulder rather than the main road, imperfections such as the one he encountered on this occasion [two-and-a-half-inch bump occupying center of shoulder] are conditions that cyclists can and should anticipate when riding on a shoulder."). Even though vehicles—including the motorcycle rider who encountered the two-inch drop-off in *Reed*—travel at far greater speeds than Hughes's bicycle here, the supreme court nevertheless concluded that drivers should expect such variations caused by normal deterioration of the roadway.

■ Here, Hughes was riding on a park trail specifically designated for hiking

and biking, and which included bridges over creeks that swelled during heavy rains. Hughes, riding during a period of heavy rains, encountered saturated wooden planks on a bridge, which included raised or displaced boards near the end of one bridge, a condition he admitted he had experienced previously to a lesser degree. Based on this record, we conclude that a recreational user would reasonably expect to encounter the type of imperfection experienced by Hughes in the course of permitted use on this trail. Accordingly, Hughes has not raised a fact issue of conscious indifference because the City had no duty to warn of the condition described. *See Morris v. Tex. Parks & Wildlife Dep't,* 226 S.W.3d 720, 727 (Tex.App.-Corpus Christi 2007, no pet.) (concluding governmental unit had no duty to warn because "[w]e cannot conclude [plaintiffs] would not reasonably have expected to encounter a campfire ring that contained ashes or coals from a fire made the night before, in the course of the permitted use of the property").

## CONCLUSION

Based on the record before us, we conclude Hughes has failed to create a fact issue as to his allegations of gross negligence. The trial court therefore erred when it failed to grant the City's plea to the jurisdiction. We reverse the trial court's order denying the City's plea to the jurisdiction and dismiss Hughes's claims against the City.