Opinion issued March 7, 2013



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-12-00848-CV

———————————————

**THE CITY OF TEXAS CITY, Appellant**

**V.**

**EDITH SUAREZ, INDIVIUALLY AND AS SURVIVING PARENT OF AS AND SS, DECEASED, AND AS SURVIVING SPOUSE OF HECTOR SUAREZ, DECEASED, Appellee**

---

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Case No. 11CV1108**

---

## MEMORANDUM OPINION

This case arises from a sad and tragic event: the drowning deaths of nine-year-old twin girls, AS and SS, and their father, Hector Suarez. The drownings

occurred in Galveston Bay at a recreational area located on a dike owned and operated by the City of Texas City. Edith Suarez, the twins' mother and Hector's wife, filed suit against the City asserting wrongful death and survival claims. She alleges that the City was negligent and grossly negligent in failing to warn of certain premises hazards that she claims led to the deaths of her daughters and husband.

The City filed a plea to the jurisdiction asserting that Suarez's claims should be dismissed because they are barred by governmental immunity. The trial court denied the plea, and the City filed this interlocutory appeal.[1] The City presents one issue challenging the trial court's denial of its plea to the jurisdiction.

We reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing Suarez's claims.

### Background Summary

The Texas City Dike is a five-mile-long manmade structure surrounded on three sides by the waters of Galveston Bay. The United States Corp of Engineers constructed the Dike in 1915 to protect the Texas City ship channel from siltation. Through the passage of special legislation, the State of Texas conveyed title of the

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (Vernon 2012) (permitting interlocutory appeal from an order that "grants or denies a plea to the jurisdiction by a governmental unit").

Dike to the City of Texas City in 1931. The legislation required that the Dike be used only for public purposes.[2]

In 1963, the legislature permitted the Dike to be used for recreational purposes. Visitors to the Dike engage in activities such as boating, fishing, picnicking, and swimming. An asphalt road runs the length of the Dike. The Dike also has boat ramps, parking areas, and concrete picnic shelters. The Dike is owned, maintained, and operated by the City of Texas City.

The Corp of Engineers also uses a designated area on the north side of the Dike as a place to dispose of the sediment or "spoil" that it dredges from the ship channel. This designated spoil area has over time developed into a man-made beach.

The Dike was heavily damaged during Hurricane Ike in September 2008. Relevant to this case, signs that had been posted on the Dike were destroyed during the hurricane. Among those signs were postings warning visitors to beware of water hazards such as undertow, rip currents, wakes from passing ships, and sink holes. Signs also warned that no lifeguards were on duty and that persons should swim in designated areas only.

For nearly two years after the hurricane, the Dike remained closed to the public. During this period, the City made repairs and improvements to the Dike.

---

[2]     *See* Act "Granting Dike" to City of Texas City, 42nd Leg., R.S., Ch. 54, 1931 Tex. Spec. Laws 134.

During the repair process, the City did not replace all of the signs that had, before the hurricane, warned of water hazards. The City, however, did erect signs at two of the Dike's boat ramps warning of such hazards. These signs read in English and in Spanish: "Warning! No Swimming-Diving." The signs also caution in English: "Beware [of] Undertow and Wake from Passing Ships."

On September 10, 2010, the City reopened the Dike to the public for recreational use. After the reopening, the City began charging a $5 per vehicle fee on weekends for non-residents to enter the Dike. The City's residents, pedestrians, cyclists, and anyone entering during the week are not charged a fee. The $5 entry fee is used for trash collection and maintenance of the Dike.

On Sunday, October 3, 2010, the Suarez family, including Edith Suarez, her husband, Hector, and their nine-year-old twin daughters, AS and SS, went to the Dike to attend a family gathering. After paying the $5 entry fee, the family parked their car near one of the concrete picnic shelters adjacent to the man-made beach area on the Dike's north side.

The twin girls immediately entered the water from the beach. Antonio Esquivel, who had also arrived at the beach for the family gathering, later testified in an affidavit as follows:

> While the vehicles were being parked, [AS] and [SS] in their street clothes began playing in the beach water. It was about 9:45 a.m. The depth of the water was at about their knees. I saw both girls struggling against the water. It appeared that they were about 10 feet

4

or so from the beach. I saw Hector running toward the water. I ran to the water. After entering the water, I could feel the pull of the current.· I could see Hector and [AS] in the water and tried to swim out to them. I saw [AS] and Hector floating on their backs about 20 feet away. Because of the force of the current, [another man] who also tried to assist and I had to help each other back to the beach.

AS, SS, and their father, Hector, drowned. Edith Suarez ("Suarez") filed a wrongful death and survival suit against the City. In her petition, Suarez alleged negligence claims based on special defect and premises defect. She also identified claims for gross negligence and attractive nuisance. Suarez alleged, inter alia, that the City was aware of hidden dangers existing in the water at the beach where her family drowned; namely, she alleged that the City knew of the strong currents and an unstable submerged beach surface. She asserted that the City had been negligent in permitting swimming at the beach and in failing to warn about the dangerous conditions associated with entering the water at that location.

Suarez alleged that the City had actual knowledge of the dangerous conditions because it had erected signs prohibiting swimming in certain areas on the Dike. The signs warned of undertows and deep holes. Suarez averred that the signage had been put up by the City "[b]ecause the area had been the subject of other drownings and swimming incidents." She pointed out that these signs had been destroyed by Hurricane Ike. She further pointed out that, when it made repairs to the Dike, the City had not placed a warning sign at the beach where her family drowned.

5

Suarez asserted that the legislature had waived the City's governmental immunity in the Texas Wrongful Death Statute. Suarez alternatively alleged that the suit was permitted under the Texas Tort Claims Act and the Recreational Use Statute.

The City answered Suarez's suit. In its answer, the City raised a plea to the jurisdiction asserting that the trial court lacked subject-matter jurisdiction because the City's immunity from suit had not been waived. The City later filed a supplemental plea to the jurisdiction. The City argued that the Wrongful Death Statute does not waive its immunity. It also asserted that its immunity had not been waived under the Tort Claims Act. The City also argued that the Recreational Use Statute limited the duty of care the City owed to the Suarez family to the duty owed to a trespasser. The City asserted that Suarez had not pled sufficient jurisdictional facts, and it challenged the underlying jurisdictional facts.

In support of its plea, the City offered the affidavit of its Director of Public Works, Tom Kessler. Appended to Kessler's affidavit are photographs of the signs installed by the City at three different boat ramps on the Dike. The photos depict the signs installed at the boat ramps as they appeared before the hurricane and after the hurricane. The signs show that, after the hurricane, the City replaced signs at two separate boat ramps warning people not to swim and informing them to beware of undertow and wakes from passing ships.

6

Suarez filed a response to the supplemental plea. In support of her response, Suarez offered the deposition testimony of the City's mayor, Matthew Doyle, and the deposition testimony of Tom Kessler. Suarez also offered the affidavit of a coastal engineering expert, William Worsham.

Suarez discussed Worsham's testimony as follows:

[Worsham] conducted a study of the incident forming the basis of this lawsuit with the intent to characterize natural and man-made forces that were potentially involved. Mr. Worsham reached several highly pertinent conclusions, including the following:

• The Texas City dike is a man-made feature.

• The recreational beach upon which the subject incident occurred is a manmade feature placed adjacent to the dike.

• The material placed adjacent to the dike to form the beach was dredged from an adjacent navigation channel and included fine-grained sediment that had the effect of making the submerged beach surface noticeably slippery when standing in the water.

• The presence of tidal currents and wind-generated waves interacting with the manmade beach on the morning of October 3, 2010, caused water motion adjacent to the beach shoreline of a magnitude sufficient to cause beachgoers standing in shallow water to lose their footing.

• The cuspate or scalloped surface of the subject beach is characteristic of a beach that can generate seaward-moving water motion known as rip currents when waves interact with the cuspate surface.

• The dike and manmade beach interacted with the waves and tidal currents naturally present to cause energetic breaking waves and stronger currents, each of which·was highly variable in strength and direction.

7

• The breaking waves produced by this interaction were sufficient to cause young persons and adults to lose balance. The likelihood of losing balance increased rapidly in the surf zone, such that even water depths of less than two feet were capable of causing loss of balance.

• The conditions found on the particular beach in question are unique in the upper Texas coastal region and do not exist naturally anywhere in Texas.

Suarez asserted that Worsham's testimony "contradicts the City's contention that the wave forces and current forces that contributed to the drownings . . . were entirely natural phenomena." Suarez continued,

It is not simply the risk of drowning in any body of water that lies at the heart of Suarez's allegations. It is the risk of drowning in this particular body of water at this particular beach that was created under the authority of the City of Texas City; was owned, operated, and managed by the City of Texas City; and where rip currents and a "perfect storm" of man-made and natural forces converged in a way that does not occur anywhere else on the Texas Gulf Coast.

Suarez asserted that the City had an actual awareness of the hazards existing at the beach area. Suarez pointed to Mayor Doyle's testimony indicating an awareness by the City that people swam "all around" the Dike. She also pointed to the mayor's testimony in which he stated that the signs at the boat ramps cautioning people not to swim were intended to warn people not to swim anywhere on the Dike; the warnings were not intended to be limited to the boat ramp areas.

Suarez further asserted as follows in her response:

The presence of signs in some locations and not others is an indication that the City was aware of the danger of rip currents. The City's failure to replace warning signs [after the hurricane] is evidence

8

of its indifference to that danger and, in particular, to the danger it posed to beach users. While Mayor Doyle points to signs warning users of the Dike's boat ramps of undertows and rip currents, the City afforded no such warning to swimmers, the Dike's most vulnerable users.

Following a hearing, the trial court denied the City's plea to the jurisdiction and its motion for summary judgment. This interlocutory appeal followed. The City raises one issue asserting that the trial court erred by denying its plea to the jurisdiction.

## Plea to the Jurisdiction

### A. Standard and Scope of Review

A plea to the jurisdiction seeks to dismiss a case for want of jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). When reviewing whether a plea was properly granted, we first look to the pleadings to determine if jurisdiction is proper, construing them liberally in favor of the plaintiffs and looking to the pleader's intent. *Id.* at 226. The allegations found in the pleadings may either affirmatively demonstrate or negate the court's jurisdiction. *Id.* at 226–27. If the pleadings do neither, it is an issue of pleading sufficiency and the plaintiff should be given an opportunity to amend the pleadings. *Id.* "However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised," even when those facts may

9

implicate the merits of the cause of action. *Id*. at 227. If that evidence creates a fact issue as to the jurisdictional issue, then it is for the fact-finder to decide. *Id.* at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id*. at 228. In considering this evidence, we "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id*.

## B.  Texas Wrongful Death Statute

Generally, the doctrine of governmental immunity protects political subdivisions, such as cities, from suit and liability. *See Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Immunity from suit, as distinguished from immunity from liability, deprives a trial court of subject matter jurisdiction unless the government has consented to being sued. *Miranda*, 133 S.W.3d at 224; *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). The governmental entity's consent to suit allows the trial court to exercise jurisdiction over the lawsuit. *Jones*, 8 S.W.3d at 638. A plaintiff bears the burden to affirmatively demonstrate a trial court's jurisdiction by alleging a valid waiver of immunity, which may be either a reference to a statute or to express legislative permission. *Id.*

10

Suarez alleged in her petition that the Wrongful Death Statute waives the City's immunity. Section 71.002(b) of the statute provides, "A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." TEX. CIV. PRAC. & REM. CODE ANN. § 71.002(b) (Vernon 2008). The statute defines "person" to mean "an individual, association of individuals, joint-stock company, or corporation or a trustee or receiver of an individual, association of individuals, joint-stock company, or corporation." *Id.* § 71.001(2) (Vernon 2008). The statute further defines "corporation" to include a municipal corporation; that is, a city. *Id.* § 71.001(1). Applying these definitions, Suarez contends that the statute waives the City's immunity from suit because it provides that a city may be held liable for wrongful death damages.

To waive immunity, the statute at issue must contain a clear and unambiguous expression of waiver. *Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 759 (Tex. 2011) (citing TEX. GOV'T CODE § 311.034; *Taylor*, 106 S.W.3d at 696). As pointed out by the City, the Wrongful Death Statute expressly states that it applies only if the individual injured would have been entitled to bring an action for the injury if the individual had lived. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.003(a) (Vernon 2008).

11

Here, AS, SS, and Hector Suarez would not have been entitled to bring an action against the City unless they first showed that the City's immunity from suit had been waived. *See Miranda*, 133 S.W.3d at 224.

Moreover, the Wrongful Death Statute can be reasonably construed as consistent with governmental immunity. The statute applies to private individuals and entities and municipal corporations alike; thus, the statute is not without meaning when construed against an asserted waiver of immunity. *See Rolling Plains Groundwater*, 353 S.W.3d at 759; *cf. Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 8 (Tex. 2000) (holding that the anti-retaliation statute had no meaning absent waiver of sovereign immunity). Even if the statute's definitions of "person" and "corporation" created an ambiguity, we must construe ambiguities in a manner that retains immunity. *Rolling Plains Groundwater*, 353 S.W.3d at 759. We hold that the Wrongful Death Statute does not waive the City's immunity from suit.

## C.    Governmental vs. Proprietary Functions

In her response to the City's jurisdictional plea, Suarez asserted that a fact issue exists with respect to whether the City is immune from suit because its conduct of operating and managing the Dike is a proprietary function rather than a governmental one, as the City argues.

The Texas Constitution authorizes the Texas Legislature to "define for all purposes those functions of a municipality that are to be considered governmental

and those that are proprietary . . . ." TEX. CONST. art. XI, § 13; *see Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). A municipality engaged in a function defined by the legislature as governmental is entitled to governmental immunity absent a legislative waiver of immunity. *Hudson v. City of Houston*, No. 01–07–00939–CV, 2011 WL 1376168, at *5 (Tex. App.—Houston [1st Dist.] Jan. 13, 2011, pet. denied); *see Tooke*, 197 S.W.at 343.

In contrast, governmental immunity does not protect a city from suit when the claim arises from the performance of a proprietary function. *See Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949); *see also Tooke*, 197 S.W.3d at 343. As a result, a city is liable to the same extent as a private party if it is negligent while engaged in the performance of a proprietary function. *Gates v. City of Dallas*, 704 S.W.2d 737, 739 (Tex. 1986); *Hudson*, 2011 WL 1376168, at *5.

In the Texas Tort Claims Act ("TTCA"), the legislature has described governmental functions as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a) (Vernon 2011). On the other hand, the legislature has defined a proprietary act as an act performed by a municipality in its discretion, primarily for the benefit of those within its corporate limits rather than for the general public. *Id*. § 101.0215(b).

13

In TTCA section 101.0215, the legislature provides a nonexclusive list of 39 municipal functions, classifying each function as either governmental or proprietary. *See id.* § 101.0215(a)–(b). Among the designated governmental functions, the legislature listed "parks and zoos" and "recreational facilities, including but not limited to swimming pools, beaches, and marinas." *Id.* § 101.0215(a)(13), (23). As interpreted by Texas courts and the legislature, the terms "parks" and "recreation" have broad meanings. *City of Plano v. Homoky*, 294 S.W.3d 809, 814 (Tex. App.—Dallas 2009, no pet.) (citing *Lewis v. City of Fort Worth*, 89 S.W.2d 975, 978 (Tex. 1936)). A municipal park has been defined as "'a place where the public generally may go for various kinds of recreation and amusement.'" *Id.* (quoting *Lewis*, 89 S.W.2d at 978). Parks are also tracts of land "'ornamented and improved as a place of resort for the public, for recreation and amusement of the public.'" *Id.* (quoting *King v. City of Dallas*, 374 S.W.2d 707, 710 (Tex. Civ. App.—Dallas 1964, writ ref'd n.r.e.)). "Recreational parks are governmental in design because their purpose is to promote and benefit the 'health and pleasure of the people at large.'" *Id.* (quoting *Wiggins v. City of Fort Worth*, 299 S.W. 468, 471 (Tex. Civ. App.—Fort Worth 1927), *aff'd*, 5 S.W.2d 761 (Tex. Comm'n App. 1928)). By analogy, the legislature in the Recreational Use Statute has broadly defined "recreation" to include swimming, boating, picnicking, and

14

"any other activity associated with enjoying nature or the outdoors." TEX. CIV. PRAC. & REM. CODE ANN. § 75.001(3)(C), (D), (F), (L) (Vernon 2011).

It is not in dispute that the Dike is a place where the public at large goes to enjoy a variety of recreational activities, such as swimming, boating, and picnicking. In other words, the Dike serves the same purposes as described in the broad interpretation that the law has given "parks" and "recreational facilities." *See Homoky*, 294 S.W.3d at 814 (holding that operation of a golf course is encompassed within the governmental functions listed in the TTCA). In addition, Suarez's claims center on her allegation that the City negligently managed the beach area where her family drowned. The legislature expressly mentions "beaches" as a specific example of a recreational facility. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(23). Given the broad interpretations afforded "parks" and "recreational facilities," we conclude that the governmental functions listed in the TTCA encompass the City's operation and management of the Dike. *See Homoky*, 294 S.W.3d at 814–15.

Nonetheless, Suarez contends that evidence indicates that the City's operation of the Dike is not a governmental function because such operation is more akin to an "amusement," which the legislature lists as a proprietary function. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(b)(2). Suarez points to Mayor Doyle's testimony that the Dike is operated for the benefit of the City's residents.

15

Suarez also points out that City charges non-residents $5 to enter the Dike. She asserts that these payments benefit the City and its citizens. When read in context, however, the evidence shows that the entry fees are used by the City for trash pickup and maintenance of the Dike. Thus, the evidence indicates that the entry fee benefits all who use the Dike, not just the City's residents.

In any event, if a City's actions are included as a governmental function in the TTCA, we have no discretion, regardless of the City's motives, to declare the actions as proprietary. *Homoky*, 294 S.W.3d at 814; *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 357 (Tex. App.—San Antonio 2000, pet. denied); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(c) (providing that "the proprietary functions of a municipality do not include those governmental activities listed under Subsection (a)").

Having concluded that the City's management of the Dike falls within the classification of governmental functions listed by the legislature in the TTCA, we are precluded from holding that any of the activities related to the management of Dike are proprietary. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(c); *see also City of San Antonio v. Polanco & Co., L.L.C.*, No. 04–07–00258–CV, 2007 WL 3171360, at *4 (Tex. App.—San Antonio Oct. 31, 2007, pet. denied) (mem. op.); *City of Weslaco v. Borne*, 210 S.W.3d 782, 792–93 (Tex. App.—Corpus Christi 2006, pet. denied). Because the City was engaged in a statutorily defined

16

governmental function, the City's immunity from suit is retained, unless it has otherwise been waived by the legislature.

## D.     Tort Claims Act and Recreational Use Statute

The legislature has provided a limited waiver of governmental immunity from suit for certain tort claims under the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021, 101.025 (Vernon 2011). The TTCA includes, among other things, a limited waiver of the state's immunity from suits alleging personal injury or death caused by premises defects.[3] *Id*. §§ 101.021(2), 101.022. Here, Suarez's petition raised allegations of premises defect.[4] *See State*

---

[3]     Suarez also alleged in her petition that her claim, in part, arose from a special defect in addition to a premises defect. A special defect is a subset of a premises defect. *See Davis v. Comal Cnty. Com'rs Court*, No. 03–11–00414–CV, 2012 WL 2989220, at *2 (Tex. App.—Austin July 13, 2012, no pet.) (mem. op.). Under Texas law, whether a complained-of condition is classified as a premise defect or a special defect controls the entrant's status, which in turn determines the duty of care owed to the entrant by the governmental unit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022; *City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008).

[4]     Suarez also alleges claims of general negligence and attractive nuisance in her petition. A plaintiff asserting a premises defect claim is limited to the TTCA provisions delineated by the section on premises defects and may not assert a general negligence theory. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 233 (Tex. 2004). We further note that the Tort Claims Act expressly excludes attractive nuisance as a basis for waiver of sovereign immunity. TEX. CIV. PRAC. & REM. CODE ANN. § 101.059 (Vernon 2011). In addition, Suarez alleges that the City's immunity is waived based on its failure to replace certain warning signs after the hurricane. She alleged that this constituted a use of tangible personal property sufficient to waive immunity under TTCA section 101.021(2). That section provides, in part, that a governmental unit is liable for personal injury or death caused by the use of tangible personal property. *Id*. § 101.021(2) (Vernon 2011). The Supreme Court of Texas has recently reiterated, "It is well settled that mere nonuse of property does not suffice to invoke section 101.021(2)'s

17

*v. Schumake*, 199 S.W.3d 279, 283 (Tex. 2006) (citing TTCA provision waiving sovereign immunity for premises defect claim in case involving drowning death of child swimming in a state park river who was sucked underwater by a powerful undertow and trapped in man-made culvert); *see also City of Weston v. Gaudette*, 287 S.W.3d 832, 836 (Tex. App.—Dallas 2009, no pet.) (defining premises defect as a defect or dangerous condition arising from a condition of the premises).

The type of duty owed to a plaintiff is part of the waiver analysis. *City of Dallas v. Hughes*, 344 S.W.3d 549, 554 (Tex. App.—Dallas 2011, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021, 101.022). In premises-defect cases, the governmental unit owes "only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises" in which case the duty owed is that owed to an invitee. TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a); *see City of Irving v. Seppy*, 301 S.W.3d 435, 441 (Tex. App.—Dallas 2009, no pet.); *Garcia v. State*, 817 S.W.2d 741, 742 (Tex. App.—San Antonio 1991, writ denied).

The TTCA further modifies a governmental unit's waiver of immunity from suit by imposing the liability limitations prescribed in the Recreational Use Statute.

---

waiver." *City of N. Richland Hills v. Friend*, 370 S.W.3d 369, 372 (Tex. 2012). Here, Suarez's allegation that the City failed to replace certain warning signs does not allege a use of tangible property but is an allegation of non-use of such property. Accordingly, it does not fall within the waiver of immunity defined in section 101.021(2). *See id.* at 372–73.

*Miranda*, 133 S.W.3d at 225 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.058). The Recreational Use Statute limits the governmental unit's liability as a premises owner when the plaintiff engages in recreation on the premises. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 75.001–.003 (Vernon 2011 & Supp. 2012); *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 659–60 (Tex. 2007). In such a case, chapter 75 controls over the TTCA. TEX. CIV. PRAC. & REM. CODE ANN. § 75.003(g) (providing that chapter 75 controls over chapter 101 to extent chapter 75 limits liability of governmental unit under circumstances in which governmental unit would be liable under chapter 101); *id.* § 101.058 (Vernon 2011) (providing same). When injury or death results on government-owned, recreational land, the Recreational Use Statute limits the governmental unit's duty to that owed by a landowner to a trespasser. TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(c)(2), (f) (defining duty as that owed to trespasser); *see Schumake*, 199 S.W.3d at 283. Thus, when applicable, the Recreational Use Statute elevates the plaintiff's burden to require a showing of gross negligence, malicious intent, or bad faith. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(d); *Flynn*, 228 S.W.3d at 659.

Because it is not in dispute that the Suarez family entered the Dike to engage in recreation, the Recreational Use Statute applies to limit the City's liability. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 75.001(3) (defining "recreation"); *see also*

*Homoky*, 294 S.W.3d at 817. Our analysis involves only the standard for gross negligence. Suarez has not alleged that the City acted with malicious intent or in bad faith.

Gross negligence is "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." *Shumake*, 199 S.W.3d at 287 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21 (Tex. 1994)). Gross negligence, as applied under the Recreational Use Statute, involves two components: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of risk involved, but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others. *See Miranda*, 133 S.W.3d at 225.

Speaking to the second subjective component, the Supreme Court of Texas has explained: "[W]hat separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but [its] acts or omissions demonstrate that [it] did not care." *Louisiana–Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999); *see also City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008) (holding that "actual knowledge" element of a premises defect cause of action

20

requires knowledge that the dangerous condition existed at the time of the accident).

In her petition, Suarez alleged that the City had actual knowledge of "dangerous currents and an unstable bottom." Suarez alleged that, "[b]ecause the area has been the subject of other drownings and swimming incidents, the [City], in the past put up signs giving warning of undertows, deep holes and areas where swimming was not allowed." Suarez also averred,

> There were dangerous currents and an unstable bottom that had been created through erosion, ship movements in the Houston ship channel and various weather conditions including hurricanes and storms over the years. In addition, there had been numerous drownings and swimming events to where [the City], knew dangerous conditions existed in the area where these drownings occurred.

Suarez's petition did not contain allegations that the City had knowledge of the unique danger resulting from a confluence of man-made and natural conditions, which she later alleged in her response to the plea. Rather, in her petition, she alleged only naturally occurring conditions as the premises peril causing her family to drown. This is noteworthy.

In *City of Waco v. Kirwan*, the Supreme Court of Texas clarified the duty owed by landowners to recreational users under the Recreational Use Statute, holding that a landowner does not generally owe a duty "to protect or warn against the dangers of natural conditions on the land." 298 S.W.3d 618, 626 (Tex. 2009); *see also Tex. State Univ.–San Marcos v. Bonnin*, No. 03–07–00593–CV, 2010 WL

21

4367013, at *4 (Tex. App.—Austin Nov. 5, 2010, no pet.) (mem. op.) (holding plaintiffs could not plead valid gross negligence claim under Recreational Use Statute for failure to warn of a turbulent undertow, which led to their son's drowning death because undertow was a naturally occurring condition). In *Kirwan*, the supreme court held that the City of Waco retained its governmental immunity in connection with a premises liability claim based solely on the collapse of a naturally occurring cliff in a city park. *Kirwan*, 298 S.W.3d at 625–29.

The *Kirwan* court drew a distinction between premises liability claims based solely on naturally occurring conditions and those based on artificial or man-made conditions. *Id.* at 622. The court distinguished its earlier holding in *Shumake*, a case in which a nine-year-old girl, tubing in a state park river, had drowned after being sucked into a man-made culvert by a strong undertow. *Id.*; *see Shumake*, 199 S.W.3d at 288. The *Kirwan* court noted that the claims in *Shumake* were not based on a naturally occurring condition as were the claims in *Kirwan*. *Kirwan*, 298 S.W.3d at 622.

In its plea to the jurisdiction, the City relied on *Kirwan*, asserting that, because she was alleging her family drowned because of naturally occurring conditions, it had no duty to warn of those conditions. The City asserted that Suarez's pleading affirmatively negated jurisdiction.

When she responded to the City's plea, Suarez effectively amended her allegations against the City. In her response, Suarez stated, "It is not simply the risk of drowning in any body of water that lies at the heart of [her] allegations. It is the risk of drowning in this particular body of water at this particular beach." She described the dangerous condition present at the beach as "a perfect storm of man-made and natural forces that converged in a way that does not occur anywhere else on the Texas Gulf Coast."

Suarez relied on the affidavit of her expert, William Worsham, to explain the unique perils existing at the beach. In his affidavit, Worsham explained that "[t]he presence of tidal currents and wind-generated waves interacting with the manmade beach on the morning of October 3, 2010, caused water motion adjacent to the beach shoreline of a magnitude sufficient to cause beachgoers standing in shallow water to lose their footing." He explained that dredged sediment or "spoil," placed on the beach by the Corp of Engineers, had made the submerged beach slippery. Worsham opined that the beach had a cuspate or scalloped surface that generated rip currents. He stated that "[t]he dike and manmade beach interacted with the waves and tidal currents naturally present to cause energetic breaking waves and stronger currents, each of which·was highly variable in strength and direction." According to Worsham, "The breaking waves produced by this interaction were sufficient to cause young persons and adults to lose balance. The likelihood of

23

losing balance increased rapidly in the surf zone, such that even water depths of less than two feet were capable of causing loss of balance."

Suarez also pointed to evidence offered in the jurisdictional proceedings showing that, before Hurricane Ike, the City had erected signs at various locations on the Dike warning visitors to swim only in designated areas and cautioning them to beware of undertows and rip currents. In her response, Suarez wrote, "The presence of signs in some locations and not others is an indication that the City was aware of the danger of rip currents." As the City pointed out, Suarez did not explain, nor is it apparent, how such warnings indicate that the City had actual knowledge of the uniquely perilous conditions, caused by a confluence of man-made and natural conditions, she alleged existed on the day of the drownings. To the contrary, the signs warned of naturally occurring marine hazards commonly found in the ocean. The evidence showed that the City had placed the signs at various locations around the Dike but no evidence indicated that a warning sign had at any time in the past been erected at the beach.

In addition, the warning signs, to which Suarez pointed, were erected before the hurricane. The evidence showed that the Dike was damaged by the hurricane and then repaired. The evidence also showed that, since the hurricane, the Corp of Engineers had placed additional spoils on the beach area, indicating that the area had been changed since the signs were erected. In short, no reasonable inference

24

may be drawn that the City had actual awareness of the alleged unique and perilous conditions present at beach at the time of the drownings based on its placement of signs warning of common marine hazards at other locations on the Dike more than two years before the drowning deaths in this case. *Cf. Prairie View A & M Univ. v. Brooks*, 180 S.W.3d 694, 707 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that actual knowledge requires finding State knew of dangerous condition that caused injury, not just proof State was aware of related condition creating danger).

Manager of Public Works, Tom Kessler, did acknowledge in his deposition that there had been other drownings at the Dike before October 3, 2010, and some had involved children. He stated that he did not know how many drownings there had been. No evidence was presented or allegations made when the drownings had occurred, where they had occurred on the five-mile-long Dike, or under what circumstances they had occurred. The record contains no allegations or jurisdictional evidence that any drownings had been attributed to the unique conditions described by Worsham in his affidavit. *See Kirwan*, 298 S.W.3d at 625 (noting that, although it had received reports of other falls from cliffs in the park, the city had received no reports of a cliff crumbling, which was the dangerous condition underlying the plaintiff's premises claim); *cf. Shumake*, 199 S.W.3d at 281, 288 (concluding that plaintiffs had alleged sufficient jurisdictional facts to

show gross negligence in drowning case in which it was undisputed that the park had received complaints, only days before, of others that had nearly drowned from the same alleged risk at the same spot on the river).

The record also contains affirmative evidence indicating that the City had no actual knowledge of the unique perils Suarez alleges existed at the beach at the time of the drownings. Evidence was presented showing that the City had not commissioned any studies to determine the effect of the Dike on wave action or other naturally occurring conditions. Mayor Doyle testified in his deposition that the City had never conducted any type of analysis or risk assessment to determine whether there were dangerous currents that could affect swimmers at the beach area. The mayor also testified that he was not aware that the presence of the Dike created rip currents. The evidence showed that Mayor Doyle was the person who made the decision with respect to what signs should be erected and where they should be erected. The record also shows that the drowning deaths occurred less than one month after the reopening of the Dike following its nearly two-year closure.

After a review of the jurisdictional evidence in the record, we conclude that there is no evidence that creates a factual dispute with regard to whether the City had actual knowledge or awareness of the alleged unique and dangerous property condition existing at the beach at the time of the drowning deaths of Suarez's

26

family. In other words, the record conclusively shows that the City did not have actual awareness of the unique peril. The record indicates that Suarez has been given a full and fair opportunity to develop the record in this case, having deposed city officials, obtained written discovery, and retained expert assistance in developing her claim. *See Rusk State Hosp. v. Black*, No. 10–0548, 2012 WL 3800218, at *6 (Tex. Aug. 31, 2012).

We conclude that Suarez cannot bring a valid gross negligence claim under the Recreational Use Statute; thus, the City's immunity from liability for that claim is not waived. As a result, the City's immunity from suit also remains intact. *See Kirwan*, 298 S.W.3d at 629.

We hold that the trial court erred when it denied the City's plea to the jurisdiction. We sustain the City's sole issue.[5]

## Conclusion

We reverse the order of the trial court and render judgment dismissing Suarez's claims against the City of Texas City.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

---

[5] We need not address other sub-issues and arguments that the City raises in support of its plea to the jurisdiction.

27